Melvin **FLEETWOOD**, Petitioner,

v.

**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

No. 84–1845.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 7, 1985.

Decided Nov. 5, 1985.

Rehearing and Rehearing En Banc
Denied Jan. 29, 1986.

Richard B. Donaldson, Jr., Newport News, Va. (Jones, Blechman, Woltz & Kelly, P.C., Newport News, Va., on brief), for petitioner.

Lawrence P. Postol, Washington, D.C. (Junius C. McElveen, Jr., Jones, Day, Reavis & Pogue, Washington, D.C., on brief), for respondents.

Before WINTER, Chief Judge, SNEEDEN, Circuit Judge, and WARRINER, United States District Judge for the Eastern District of Virginia, sitting by designation.

SNEEDEN, Circuit Judge:

Melvin Fleetwood was granted a 40-percent permanent partial disability award, based upon an average weekly wage of $193.85, for a back injury that occurred on July 11, 1975, when he was employed by Newport News Shipbuilding and Dry Dock Company as a handyman. The partial disability award was made pursuant to The Longshoremen's and Harbor Workers' Compensation Act (LHWCA), ch. 509, 44 Stat. 1424 (1927), codified as amended at 33 U.S.C. §§ 901–950 (1982), which allows any person engaged in maritime employment to recover compensation if his death or disability results from an injury incurred upon the navigable waters of the United States or upon any adjoining area customarily used to service a vessel.[1] The 40-percent

---

1. The Longshoremen's and Harbor Workers' Compensation Act is a workmen's compensation

disability payments, based upon an average weekly wage of $193.85, began on March 8, 1978; and, about two years later, the employer applied for a modification of the compensation order, arguing that a "change of conditions" had occurred in that Fleetwood had acquired new job skills and was working as a production coordinator. *See* 33 U.S.C. § 922 (employer or employee may obtain modification of award based upon a "change in conditions").

 The employer argued that Fleetwood no longer suffered from any post-injury wage-earning capacity loss.[2] Fleetwood argued that his original award could not be modified because under Section 22 of the statute, the term "change of conditions" included only a change in the worker's physical condition and the fact that a worker was earning higher wages in his new job than in his pre-injury job was irrelevant as long as there was no improvement in the condition of his back. The administrative law judge (ALJ) concluded that modifications based upon a change in the claimant's wage-earning capacity were appropriate under the statute and that the record as a whole showed that Fleetwood no longer suffered a wage-earning capacity loss. We address two issues on appeal: 1) Does Section 22 of the Longshoremen's Act permit a modification of a compensation award based solely upon a change in a worker's wage-earning capacity? 2) Was there substantial evidence to support the

ALJ's finding that Fleetwood no longer had a wage-earning capacity loss?

## I.

At the time of his injury, Fleetwood was working as a third-class handyman. On July 11, 1975, he was descending a ladder, carrying a bucket of nuts and bolts, when he felt a pain in his back. The back pains grew more acute, and in August 1975, he was hospitalized and a partial hemilaninectomy was performed. He underwent further back surgery in July 1976.

The employer paid compensation for Fleetwood's temporary total disability from August 2, 1975, to March 28, 1976, and from July 7, 1976, to January 2, 1977, at a compensation rate of $124.57 per week. The employer paid temporary partial disability at a compensation rate of $47.64 per week from February 1, 1978, to February 27, 1978, as well as paying temporary total disability compensation from February 28, 1978, to March 7, 1978, at a rate of $124.57 per week.

Freeman C. Murray, the administrative law judge, after a hearing on July 10, 1978, found that Fleetwood suffered from a 40-percent permanent partial disability starting on March 8, 1978, and continuing. Fleetwood's average weekly wage prior to the injury was found to be $193.85.

After this first hearing, Fleetwood continued to work for Newport News Shipbuilding, and on July 1, 1978, he applied for

---

statute designed to ensure that maritime workers receive medical and disability payments for work-related injuries; and, it places the financial burden for the work-related injuries upon the employer whose actions caused the injury. *See Caldwell v. Ogden Sea Transport, Inc.,* 618 F.2d 1037, 1042 (4th Cir.1980). The LHWCA was first passed in 1927 and subsequently has been amended several times. *See* ch. 685, 52 Stat. 1164 (1938 amendment); Pub.L. No. 86–171, 73 Stat. 391 (1959 amendment); Pub.L. No. 92–576, 86 Stat. 1251 (1972 amendment); Pub.L. No. 98–426, 98 Stat. 1639 (1984 amendment).

**2.** To recover compensation under the LHWCA, a worker must prove that he is disabled by reason of his industrial injury from performing his regular employment. *See Newport News Shipbuilding v. Director, OWCP,* 592 F.2d 762,

763 (4th Cir.1979). Section (10) of the LHWCA defines "disability" as follows:

"Disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of the injury in the same or any other employment....

Under the LHWCA, the term "disability" is not synonymous with physical injury, but rather the term "disability" "is an economic [concept] based on a medical foundation." *Perini Corp. v. Heyde,* 306 F.Supp. 1321, 1325 (D.R.I.1969). Thus, a reviewing court must consider the claimant's age, education, experience, mentality, and ability to work as well as the extent of the physical injury. *See John W. McGrath Corp. v. Hughes,* 289 F.2d 403, 405 (2nd Cir.1961) (disability evaluated in economic rather than medical terms).

and obtained the job of production coordinator with this same employer. A production coordinator is a salaried employee, and the salary as of July 1, 1978, was $1,065.00 a month. As a production coordinator, Fleetwood would examine drawings of piping system arrangements and digitize those arrangements. He would then enter these data into the computer, and the computer would generate the coordinates for bending the pipes as well as fabricate the instructions for pipe manufacture. Fleetwood also was responsible for checking the computer printouts from the CAPDAM (Computer Aided Piping Design and Manufacturing) system.

The employer sought to have the award modified pursuant to Section 22 of the LHWCA.[3] A hearing on the issue of modification was held before the same ALJ who heard the original claim, and he concluded on March 3, 1981, that Fleetwood no longer had a wage-earning capacity loss due to his injury. Fleetwood appealed the decision to the Benefits Review Board, but the ALJ's decision was unanimously affirmed on June 15, 1984. Fleetwood petitioned this Court to set aside the decision of the Benefits Review Board.

## II.

The Benefits Review Board held that under Section 22 of the LHWCA a change in an employee's wage-earning capacity, without a change in the employee's physical condition, could be the basis for the modification of an award. We agree with the Board's interpretation of the Act's statutory language because it is consistent with the statute's purpose and is a reasonable view of the statutory language. *See Connecticut Dept. of Income Maintenance v. Heckler*, — U.S. —, 105 S.Ct.

2210, 85 L.Ed.2d 577 (1985) (Agency's construction of statute need not be the only reasonable interpretation); *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982) ("[I]nterpretation of a statute by an agency charged with administration of the statute is entitled to substantial deference."). *But see Potomac Electric Power Co. v. Director, OWCP*, 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980) (Benefits Review Board interpretation is not entitled special deference from courts.).

The statute section in question provides as follows:

> Upon his own initiative, or upon the application of any party in interest, on the ground of a change in conditions or because of a mistake in a determination of fact by the deputy commissioner, the deputy commissioner may, at any time prior to one year after the date of the last payment of compensation, whether or not a compensation order has been issued, or at any time prior to one year after the rejection of a claim, review a compensation case in accordance with the procedure described in respect of claims in section 919 of this title, and in accordance with such section issue a new compensation order which may terminate, continue, reinstate, increase, or decrease such compensation, or award compensation. . . .

Fleetwood argues that employers are precluded from seeking a modification of a compensation award unless the employee's physical condition has changed since the time of the initial award.[4] We reject this reading of the statute because it is not in keeping with the purpose of the Act, which

---

**3.** Some provisions of the LHWCA have been incorporated by reference into other federal statutes, including the Black Lung Benefits Act. *See* 30 U.S.C. § 932. The Black Lung Act, however, does not inflexibly incorporate every provision of the Longshoremen's Act. *See Director, OWCP v. National Mines Corp.*, 554 F.2d 1267, 1273 (4th Cir.1977). Under the LHWCA, claims are adjudicated by ALJ's, the Benefits Review Board hears appeals from the decisions of the ALJ's, and the courts of appeals review deci-

sions of the Board. *Id.* The LHWCA provides that the ALJ's are to follow the procedures set forth in the Administrative Procedure Act. *See* 33 U.S.C. 919(d); 5 U.S.C. 554.

**4.** The parties have agreed that Fleetwood's physical condition has not changed or improved since the time of the initial compensation award.

is to compensate workers for injuries that affect their wage-earning **capabilities**.

■ Under the Act, "disability" is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." 33 U.S.C. § 902(10). Thus, the Board was correct when it concluded that a worker is not compensated solely for physical impairment, but rather the worker is compensated for the future economic loss attributable to the physical impairment. The worker initially must prove his loss of wage-earning capacity to obtain benefits; therefore, his wage-earning capabilities should be relevant when considering a modification of an award. Thus, for example, if an employee initially was awarded a 40-percent partial disability award, and later found that his wage-earning capacity was much less than originally determined, he could then seek a modification. Likewise, an employer who finds that an employee's wage-earning capacity has not been affected to the degree originally determined should be able to seek a modification. As this case demonstrates, it is possible for a worker to show no physical improvement, but at the same time to acquire new job skills that enable him to compete again in the workforce. A sensible modification procedure would allow employees whose loss of wage-earning capacity becomes more apparent over time to obtain a larger disability award at a later date without requiring such an employee to demonstrate that his physical condition caused by the accident had changed. We fail to see how an employee whose wage-earning capacity had declined could be treated differently from the employee whose wage-earning capacity had improved without rendering inconsistent interpretations of the same statutory section of the LHWCA.

Without such a modification procedure, workers who had secured new skills and employment would be receiving disability compensation when they were not disabled and an unequitable distribution of limited financial resources would result. The Act is a worker's compensation statute that reflects a legislative compromise in which employees' common law tort remedies for work-related injuries were surrendered in exchange for guaranteed disability compensation. *See Potomac Electric Power Co. v. Director, OWCP*, 449 U.S. 268, 282, 101 S.Ct. 509, 516, 66 L.Ed.2d 446 (1980) (J. Blackmun, dissenting). The employer's reward for securing compensation is immunity from employee tort suits. *Id.* Over the years, the courts have moved toward viewing the statute as imposing liability without fault on employers and shipowners for work-related injuries. *See generally* Gilmore & Black, *The Law of Admiralty* § 6–1 (1975) (Supreme Court has greatly expanded liability of shipowners and other employers of maritime labor for injuries suffered in the course of employment.). Overall, the statutory scheme indicates that as long as an employee's physical injury affects his wage-earning capacity, he should be able to obtain disability payments; but, he should not be able to receive a stream of constant payments regardless of his wage-earning capacity.

Fleetwood argues that the Board had adopted the rule that a change in the claimant's physical condition is the sole grounds for modification of an award. Most of these cases relied upon by Fleetwood, however, may be distinguished, and no case cited by Fleetwood holds that modification of a compensation award cannot be granted when an employee experiences a permanent increase in wage-earning capacity. The Board, in deciding the issue in *Fleetwood,* assumed without discussion that the longstanding rule had been to allow modification only for a change in physical condition, and expressly overruled any prior contrary precedent. We review the precedent to determine if it is controlling.

In the case of *Atlantic Coast Shipping Co. v. Golubiewski,* 9 F.Supp. 315 (D.Md. 1934), a deckman, who had been knocked overboard accidentally and who sustained extensive skull fractures, was awarded temporary, partial disability payments. The employer stopped the disability pay-

ments when the employee was sentenced to life imprisonment for the murder of his wife. The employer argued that the original injury was no longer the effective cause of the loss of wages and thus a change of conditions which would allow payments to be discontinued had occurred. *Id.* at 318. The court held that the employee's jail confinement was not the type of change in condition that should allow an employer to stop temporary disability payments. *Id.*

The court reasoned that the legal theory inherent in the LHWCA was that the harbor workers' common law right of action for employer negligence would be sacrificed in exchange for an employer-insured disability compensation system. The court noted that the awards to employees were structured to be paid over time rather than to be paid as a lump sum, but that the awards were like tort damage payments in some respects and that a worker who initially had a legitimate claim should not be deprived of the stream of payments, if he later became unable to work for an unrelated reason, such as jail confinement. This case did hold that a physical change in a worker's condition, as opposed to a change in the worker's wage-earning capacity, was the only type of change that would allow an ALJ to modify an award.

In *Bay Ridge Operating Co., Inc. v. Lowe,* 14 F.Supp. 280 (S.D.N.Y.1936), the employee who was receiving temporary disability payments was later committed as an incompetent to a state hospital for the insane. The insanity was found not to be a result of his work-related injury. The Court held that, even though the employee had later become incapacitated from another cause, the employee, whether he was receiving temporary or permanent disability payments, would be entitled to continued disability payments. The court in *Bay Ridge Operating Co.* relied upon the reasoning in *Atlantic Coast Shipping* to reach this result. Both *Bay Ridge Operating Co.* and *Atlantic Coast Shipping* did not deal with the issue of whether an employer may obtain the modification of an award if the employer is later able to show

that the worker's capacity to earn wages has improved.

Fleetwood also cites the case of *Rizzi v. Four Boro Contracting Co.,* 1 Ben.Rev. Bd.Serv. 130 (1974). In *Rizzi,* the claimant had received the maximum benefit allowed for his permanent, partial disability and his payments were then discontinued. He applied for a modification of the award under Section 22 of LHWCA and alleged that he had suffered from a total permanent disability since the time of the accident. The ALJ found that the claimant had become permanently and totally disabled; however, he also found that only part of the disability was a result of the work-related accident and that the other part was the result of "unrelated degenerative developments." 1 Ben.Rev.Bd.Serv. at 131. The claimant had originally been awarded benefits at age 56 and applied for the modification at age 70. The Board, in affirming the ALJ's factual determination, found that the claimant's physical condition had deteriorated, but the work-related disability was not involved and therefore no increase in the award could be granted. The Board said that "change in condition" means "alteration of the physical condition of the employee caused by the accident." *Rizzi v. Four Boro Contracting Corp.,* 1 Ben.Rev.Bd. Serv. at 132 (*quoting Bay Ridge Operating Co. v. Lowe,* 14 F.Supp. 280 (S.D.N.Y. 1936)). The Board addressed only the narrow issue of whether a change in physical condition, not caused by the work-related accident, could be the basis for the modification of an award.

The three other cases cited by Fleetwood are: *General Dynamics Corp. v. Director, OWCP,* 673 F.2d 23 (1st Cir.1982); *Burly Welding Works, Inc. v. Lawson,* 141 F.2d 964 (5th Cir.1944); and *McCormick Steamship Company v. U.S. Employees' Compensation Commission,* 64 F.2d 84 (9th Cir.1933). We review the facts in these cases in some detail in order to show that they did not reject the view that a change

in wage-earning capacity could be the basis for a modification.[5]

In *McCormick Steamship,* the employee suffered a back injury which resulted in a permanent, partial disability for which he received payments of $3.96 a week, and he later petitioned for a modification of the award on the grounds that his post-injury earnings as a foreman were less than his pre-injury earnings as a stevedore. The Court, in reversing the order increasing the worker's disability payments, decided that the worker's inability to maintain his pre-injury salary level was a result of depressed economic conditions rather than a change in the wage-earning capacity of the worker. The Court said, "It cannot be that a decrease in wages necessarily represents a decrease in earning capacity." *Id.* at 86. The claimant admitted on the stand that the reason he was unable to earn as much money in his new position as he had been in his former stevedore position was that there was insufficient work on the docks even though he reported to work every day, and the Court took judicial notice of the pervasive conditions of unemployment in the 1930's. The Court mentioned that the employee's physical condition had not changed, but in fact held that a decrease in wage-earning capacity, as distinguished from just a decrease in wages, must be shown to obtain an increase in an award. *Id.* This case is consistent with the view that a change in overall wage-earning capacity must be shown to obtain a modification.

In *Burley Welding Works, Inc. v. Lawson,* 141 F.2d 964 (5th Cir.1944), the employee's wage-earning capacity after the accident was found to be 82 percent of the capacity that existed at the time of the injury. 141 F.2d at 965. The employee was a welder, and despite continued pain, he was able to do light work as a welder for the employer who employed him at the time of the injury and he earned wages that were higher than his pre-injury wages. The Court noted that the employer had continued to employ the worker despite the welder's inability to work a full day. The employer gave the worker special, light welding jobs and jobs where he would not have to bend or stoop over. The Court noted that the demand for welders was high because of the boom wartime economy and that the employee's position in the job market otherwise would be precarious. Thus, the Court concluded that the employee's wages were not indicative of an increase in wage-earning capacity and refused to decrease the compensation award. The holding of this case is consistent with our decision; however, Fleetwood points to the following language from *Burley* to support his argument that a change in physical condition is the sole prerequisite for a modification:

> It has been uniformly held that the term "change in conditions" in Section 22 of the Act, which authorizes the modification of a previous award, means a change in the employee's physical condition, and not other conditions. (citations omitted).

Our review of the cases has shown, however, that a modification, be it favorable or unfavorable to a worker, may be granted if the employer or the employee is able to show that the overall wage-earning capacity has changed substantially. *Burley's* summary of the law, which includes cita-

---

5. Fleetwood correctly points out that the Benefits Review Board itself has referred to the prior case law as prohibiting modifications unless the claimant's physical condition had changed. *See Brittain v. RMK–BRJ,* 9 Ben.Rev.Bd.Serv. 1059 (1978) ("Change in condition under Section 22 has long been held to mean only a change in the physical condition caused by the injury since the original award."). The ALJ in *Brittain* held that the claimant's physical condition had improved, and the Board, in applying the substantial evidence test, upheld this finding. The claimant had exhausted his permanent, partial disability payments, and at age 69, applied for a total, permanent disability award, but the modification was denied for failure to prove a physical change. The Board in *Fleetwood* rejected this view of Section 22 modifications, and we find that the Board's current decision to adopt a rule that focuses upon the wage-earning capacity of a claimant is a reasonable interpretation of the statute, despite the indications that it may have adhered to a contrary view previously.

tions to two cases,[6] is misleading. In *Burley* itself, the Court could have held that a physical change was essential; instead, the Court relied upon the facts showing that the welder continued to work mainly as a result of the benevolence of his employer. The *Burley* case does stand for the accepted proposition that actual post-injury wages do not necessarily reflect wage-earning capacity.[7]

The recent case of *General Dynamics Corp. v. Director, OWCP*, 673 F.2d 23 (1st Cir.1982), cites the *Burley* case in a footnote for the proposition that a "change in conditions" means a change in the employee's physical condition, not other conditions, but *General Dynamics* was quoting the summary of the law from *Burley*. Additionally, *General Dynamics* addressed a separate issue of whether a subsequent change in the law could be the basis of a petition for modification of an award.

In summary, we reject Fleetwood's argument that precedent requires the courts to limit modifications of LHWCA awards to those employees who may prove an actual change in physical condition especially in light of the Board's express decision to adopt the same rule that we have adopted in this case. We realize that the language in these cases suggests that a physical change is a prerequisite; however, none of the cases squarely confronted the issue of whether a change in actual wage-earning capacity is relevant at a modification hearing. We believe that the statutory definition of "disability" makes both the medical condition and the wage-earning capacity of a claimant relevant at an initial hearing as well as at a modification hearing.

Fleetwood also argues that Section 22 modifications should not be granted unless there is a change in physical condition because a claimant may be forever barred from receiving compensation within one year of the decision of no disability even though subsequently it becomes obvious that the claimant suffered severe economic harm. Under the Act, once there is a finding of no disability, the decision may only be modified within one year of this finding. If, however, some compensation award is made, then that award may be modified at any time within one year after the last payment of compensation. 33 U.S.C. § 922. Thus, if a determination is made that a worker suffered some wage-earning capacity loss and later it is shown that the wage-earning capacity loss was more or less than what was initially apparent, the award could be modified years later to reflect the change.

In this case, the ALJ determined at the modification hearing that Fleetwood suffered no post-injury wage-earning capacity loss. If the ALJ had made the same determination at the initial hearing, the one-year statute of limitations also would have applied. *See Bolduc v. General Dynamics Corp.*, 9 Ben.Rev.Bd.Serv. 851 (1979) (Mere possibility that claimant may lose job is too speculative a basis on which to award permanent, partial disability). We cannot solve the problem of the short statute of limitations by completely excluding modifications on the basis of a change in wage-earning capacity. Rather, the statute itself provides that at an initial determination hearing, at a modification hearing as well, any factors which may affect the *future* earnings of the claimant are to be taken into consideration. *See Devillier v. National Steel and Shipbuilding Co.*, 10 Ben.Rev.Bd.Serv. at 49 (1979) (Providing extensive list of factors that must be considered in setting claimant's wage-earning capacity).

---

**6.** The cases cited in *Burley* are: *McCormick Steamship Co. v. United States Employees' Compensation Commission*, 64 F.2d 84 (9th Cir. 1933), and *Pillsbury v. Alaska Packers Ass., 85 F.2d 758 (9th Cir.1936). The *McCormick Steamship* case, as noted above, is not a case holding that a physical change of condition is the sole basis upon which a modification may be obtained, and the *Pillsbury* case merely holds that an employer may not petition for a modification under Section 22 on the grounds that the employee was not employed at the time of the accident. *Pillsbury v. Alaska Packers*, 85 F.2d at 760.

**7.** *See* cases cited *infra* note 8.

### III.

The ALJ concluded that Fleetwood did not have a wage-earning capacity loss and the Benefits Review Board affirmed. We review to determine if there was substantial evidence to support the conclusion that the claimant was no longer disabled. *See* 33 U.S.C. § 921(b)(3). Both the employer and the employee agreed that Fleetwood's physical impairment, the back problem, had not changed so the testimony focused upon the ability of Fleetwood to retain his newly acquired job as production coordinator.

Gary Ralph Lewis, Fleetwood's personnel supervisor, testified that on February 1, 1978, Fleetwood became a salaried employee at a salary of $500.00 per month. He stated that Fleetwood was promoted from records clerk to production coordinator and that at least two raises received by Fleetwood were merit raises. Lewis testified that in Fleetwood's department a person could be promoted from the position of production coordinator to production scheduler, to production controller, to supervisor of production control.

David Roddy Bryan, III, a production controller and production engineer, testified that he supervised Fleetwood and that there was nothing connected with Fleetwood's back injury that would prevent him from being promoted through the jobs. He testified that Fleetwood is required to stand and bend over to make drawings as well as to sit and work. Fleetwood's work quality was said to be about average despite the fact that his attendance was slightly below average. Fleetwood complains about back pain, but Bryan said that he had not found that the back problem made it difficult for Fleetwood to do the job. Bryan had evaluated Fleetwood several times and requested the raises for Fleetwood.

Bryan testified that when Fleetwood started work he learned how to use CAPDAMS, a computer-aided design system used to fabricate pipe details, acquired some knowledge on how to deal with and use computerized systems, and picked up some drafting skills. Bryan testified that the three other production coordinators beside Fleetwood were high school graduates who had been on the job longer than Fleetwood and were making more money than Fleetwood. Bryan acknowledged that two persons had started as production schedulers rather than in the entry position of production coordinator, as did Fleetwood.

On cross-examination, Bryan testified that another employer—Electric Boat— used CAPDAMS to design piping for vessels. However, the claimant testified that he was not aware of any other job opportunities involving CAPDAMS and that at present his qualifications were "very slim."

Fleetwood testified that when he became a production coordinator, he had only been able to read pipe drawings and that when he first joined the department he had learned the skills that now enable him to work in his current position. He testified that he did not have any classroom training.

Fleetwood testified that he continues to have back pain and that his doctor has told him that he will have pain for the rest of his life. The judge, however, found Bryan's testimony about Fleetwood more credible. Bryan stated that Fleetwood was not required to engage in strenuous activity when he entered data to the computer and that the back injury would not deter Fleetwood from advancing. The judge specifically found that the back injury "did not interfere seriously with [Fleetwood's] job requirements." Joint Record, p. 96. Thus, Fleetwood is not engaged in a job that requires him to endure excruciating pain. *See, e.g., Haughton Elevator Co. v. Lewis,* 572 F.2d 447 (4th Cir.1978) (J. Russell dissenting) (Employee's subjective testimony as to increased pain sufficient to modify award to permanent disability).

The employer presented evidence that Fleetwood's post-injury wages as a salaried computer operator were higher than the wages that he earned as a handyman. As a salaried employee, Fleetwood's average annual earnings were computed to be as follows:

| Date | Monthly Salary | Annual Salary |
|---|---|---|
| February 1, 1978, to June 30, 1978 | $ 500.00 | $ 6,000.00 |
| July 1, 1978, to November 30, 1978 | 1,065.00 | 12,780.00 |
| December 1, 1978, to November 30, 1979 | 1,200.00 | 14,400.00 |
| December 1, 1979, and following | 1,280.00 | 15,360.00 |

The ALJ, relying upon the formula in 33 U.S.C. § 910, found that Fleetwood's average weekly wage of $193.85 before the work-related injury would result in an average annual salary of $10,080.20. Thus, the ALJ correctly found that as of July 1, 1978, Fleetwood's salary exceeded his average annual earnings as a non-salaried employee. Joint Record, p. 95. We note that at the time of the reconsideration hearing, Fleetwood had been employed in his new job as a production coordinator for over two years and apparently is still employed.

■ Our review of this evidence leads us to conclude that Fleetwood, admittedly through his own honest and hard-working efforts, no longer has a wage-earning capacity loss and therefore we affirm the discontinuation of disability payments. We do not rely solely upon the uncontroverted evidence that Fleetwood is earning more in his new position than in his old job, but have considered the other factors that may affect the future wage-earning capacity of a claimant, including the claimant's age, education, medical disability, vocational training, years on the job as a data clerk, and possible sympathetic consideration by the post-injury employer.[8]

■ Fleetwood argues that his post-injury wages did not fairly and reasonably represent his post-injury wage-earning capacity because he was able to work only by enduring almost continuous pain. Fleetwood testified that he had pain, but he did not testify that it affected his work performance. All the testimony was to the effect that Fleetwood had been able to function on the job without special consideration or help from co-workers. The best evidence in Fleetwood's favor was the fact that he missed approximately six weeks of work in 1979 as a result of his back injury.[9] But in reviewing the evidence under the substantial evidence test, we do not find

8. The case law clearly states that post-injury wages are not necessarily indicative of post-injury wage-earning capacity, but must only be considered in conjunction with other factors, such as the claimant's education and age, general economic conditions, and the regularity of the post-injury employment. *Randall v. Comfort Control, Inc.*, 725 F.2d 791 (D.C.Cir.1984) (ALJ must divine whether claimant will suffer any injury-related reduction in wage-earning capacity at any time during his life). *See also Devillier v. National Steel and Shipbuilding Co.*, 2 Ben. Rev.Bd.Serv. 649 (1979). We see no indication in the record that the ALJ gave too much weight to the fact that Fleetwood was earning wages that were higher than his pre-injury wages.

9. Fleetwood suggests that the future effect of his injury is uncertain and that we follow the case of *Hole v. Miami Shipyards Corp.*, 640 F.2d 769 (5th Cir.1981), and grant him a one-percent partial permanent disability award as a nominal amount to protect him in case his wage-earning capacity changes after one year. In the *Hole* case, the ALJ selected a one-percent figure because he determined that Hole had suffered some degree of economic harm, but that the degree of harm could not be ascertained at the time of the hearing. 640 F.2d at 773. On appeal, the Board reversed, finding that the ALJ's determination was impermissibly influenced by a concern for the short statute of limitations. The Fifth Circuit reinstated the ALJ's findings, holding that there was substantial evidence in the record to show that Hole had suffered some degree of economic harm. The Court reasoned that the Act required an ALJ to determine the effect of the disability as it may naturally extend into the future, and that a small award, designed to preserve the claimant's right to compensation in light of the uncertainty as to the amount of economic harm, would be appropriate. 640 F.2d at 772–73. The facts in this case, however, are dissimilar in that Fleetwood has failed to present sufficient evidence for the ALJ to conclude that the degree of future economic harm is uncertain. Thus, although the approach taken in the *Hole* case may be appropriate in some cases, the need for a one-percent award to protect a worker whose economic loss cannot be ascertained is not present in this case. The basis for such an award is found in Section 908(h) of the LHWCA, which provides that an ALJ shall "fix such wage-earning capacity as shall be reasonable, ... including the effect of disability as it may naturally extend into the future." 33 U.S.C. § 908(h).

that the evidence of above-average absenteeism outweighs the overwhelming evidence that Fleetwood was capable of continuing in his new job at higher wages than he received in his pre-injury job as a handyman.[10]

For the reasons set forth above, the order of the Benefits Review Board is

AFFIRMED.

WARRINER, District Judge, dissenting.

Beginning with the first opinion[1] dealing with the question, handed down in 1933, and continuing without wavering thereafter, the courts have uniformly interpreted the term "change in conditions"[2] in Section 22 of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 922 (1982), to refer exclusively to a change in the physical condition of the employee receiving compensation. This also was "the meaning generally attributed to similar phraseology in state workman's compensation acts" in existence before or shortly after the enactment of the LHWCA in 1927. *See Atlantic Coast Shipping Co. v. Golubiewski*, 9 F.Supp. 315, 317 (D.Md. 1934).

The majority's nice effort to distinguish this prior case law serves only to highlight the numerous and varied factual situations in which the federal courts have withstood temptation and have strictly adhered to this interpretation. In *McCormick Steamship Co. v. United States Employees' Compensation Commission*, 64 F.2d 84 (9th Cir. 1933), for example, the Court refused to allow the modification of a compensation order under Section 22 where the employee's earnings were diminished as a result of deteriorating economic conditions. *Id.* at 85. Conversely, the fact that an employee received higher wages because of better economic conditions in the 1940's was held not to constitute a "change in conditions" so as to allow a reduction in the employee's compensation award. *Burley Welding Works v. Lawson*, 141 F.2d 964, 966 (5th Cir.1944). The courts have refused to find a "change in conditions" where the employee was imprisoned in a penitentiary for life, *Atlantic Coast Shipping Co. v. Golubiewski*, 9 F.Supp. at 316–19, or where the employee was committed to an insane asylum. *Bay Ridge Operating Co. v. Lowe*, 14 F.Supp. 280, 280–82 (S.D.N.Y.1936).

In every one of these case, decided soon after the effective date of the Act, the respective courts explicitly stated and held that the term "change in conditions" in Section 22 refers to the physical condition of the employee receiving compensation. In a more recent case, *General Dynamics, Inc. v. Director, Office of Workers' Compensation Programs*, 673 F.2d 23 (1st Cir. 1982), the court reiterated this interpreta-

---

10. Fleetwood also argues that he could not earn his current salary with any other employer. First, Fleetwood's testimony that he knew of no similar jobs in the Norfolk area was contradicted by the testimony of his supervisor. Additionally, there was no evidence that the jobs of production coordinators were in jeopardy or that Fleetwood retained his job at the benevolent discretion of his employer. The employer has the burden of showing that the employee has available a suitable job in the community in which he lives. *See Haughton Elevator Co. v. Lewis*, 572 F.2d 447, 451 (4th Cir.1978) (J. Russell dissenting); *see also Trans-State Dredging v. Benefits Review Board*, 731 F.2d 199 (4th Cir. 1984) (J. Sprouse, dissenting). The employer put on evidence that Fleetwood had advanced and would be capable of advancing in the production department, and thus certainly met its burden in this case.

1. *McCormick Steamship Co. v. United States Employees' Compensation Commission*, 64 F.2d 84 (9th Cir.1933).

2. The pertinent part of the section reads:
 Upon his own initiative, or upon the application of any party in interest, on the ground of a change in conditions or because of a mistake in a determination of fact by the deputy commissioner, the deputy commissioner may, at any time prior to one year after the date of the last payment of compensation, whether or not a compensation order has been issued, or at any time prior to one year after the rejection of a claim, review a compensation case in accordance with the procedure prescribed in respect of claims in section 19, and in accordance with such section issue a new compensation order which may terminate, continue, reinstate, increase, or decrease such compensation, or award compensation.

tion: "[c]ourts uniformly have held that a 'change in conditions' means a change in the employee's *physical* condition, not other conditions." *Id.* at 25 (citing *Burley Welding Works, Inc. v. Lawson*, 141 F.2d at 966).

Despite fifty years, and more, of precedent, the majority has overturned this established construction of the term "change in conditions" and has revised it to have it apply to changes in economic conditions occurring during the term of compensation. Such a departure from settled prior case law is not warranted absent any indication from the Congress that such a change in the statute is what is desired by the lawmakers. Congress, it should not be necessary to add, indicates its desires by adopting legislation.

The majority substantially relies on a revised view of the statute enunciated by the Benefit Review Board. The majority correctly observed in this connection that as a general proposition, "the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982). Directly on point with respect to this specific case, however, is the Supreme Court's comment, noted but ignored by the majority, in *Potomac Electric Power Co. v. Director, Office of Workers' Compensation Programs*, 449 U.S. 268, 101 S.Ct. 509, 66 L.Ed.2d 446 (1980): "It should ... be noted that the Benefits Review Board is not a policymaking agency; its interpretation of the LHWCA thus is not entitled to any special deference from the courts." *Id.* at 278, n. 18 (citations omitted). This Court should not give the Board *any* deference in the Board's bald attempt to rewrite the statute.

Fifty years is a long time. And perhaps it can be argued that the Board's, and the courts', and the Congress' erstwhile interpretation of the phrase was inhumane, or unenlightened, or an anachronism, or something else even more disparaging. But it cannot be argued, I submit, that the prior interpretation was not and is not the law. Accordingly, I dissent.