**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,**

v.

**GENERAL DYNAMICS CORPORATION, Respondent.**

**No. 394, Docket 92–4088.**

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 1992.

Decided Dec. 28, 1992.

Michael S. Hertzig, U.S. Dept. of Labor, Washington, DC (Marshall J. Breger, Solicitor of Labor, Carol A. DeDeo, Assoc. Solicitor, Janet R. Dunlop, on the brief), for petitioner.

Norman P. Beane, Jr., Boston, MA (Diane M. Broderick, Murphy & Beane, on the brief), for respondent.

Before OAKES, NEWMAN, and MAHONEY, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This is a petition to review the April 8, 1992, order of the Benefits Review Board of the United States Department of Labor ("the Board"), granting General Dynamics

Corporation relief from its compensation liability pursuant to section 8(f) of the Longshore and Harbor Workers' Compensation Act ("the Act"), 33 U.S.C. § 908(f) (1988). The petition, brought by the Director of the Office of Workers' Compensation Programs, United States Department of Labor, ("the Director"), primarily raises the issue of the extent of deference a reviewing court must accord to the Director's interpretation of the Act. We conclude that recent decisions of the Supreme Court have superseded our prior decision on the deference issue, *Director, Office of Workers' Compensation Programs v. General Dynamics Corp.*, 900 F.2d 506 (2d Cir. 1990) ("*Krotsis*"), and we therefore vacate and remand.

## FACTS

Leo Bergeron began working as a painter and cleaner for the General Dynamics Electric Boat Division in August 1981. His duties required him to carry heavy equipment, to climb ladders, and to work in confined spaces inside of submarines. On April 21, 1985, during the course of his employment, Bergeron fell off a ladder while descending into a submarine and injured his back and leg. After several months of bed rest, Bergeron's condition did not improve. A July 1985 CT scan revealed that Bergeron had a bilateral spondylolysis, the dissolution of a vertebra; the CT scan revealed no evidence of spondylolisthesis, the forward displacement of one vertebra over another, although that condition was detected by a test in 1986. Bergeron returned to light duty work in November 1985. In 1986, his doctors concluded that rehabilitation and physical therapy would not help and that he was permanently disabled from his usual work.

Bergeron testified before the Administrative Law Judge ("ALJ") that he had twice before injured his back. In the early 1960's, Bergeron was hospitalized for approximately one month. In February 1969, approximately sixteen years prior to the incident at issue, he strained his back following a twisting motion at work. Bergeron was diagnosed as having a mild spondy-

lolisthesis and a narrow spondylolysis defect on his left side. Bergeron was again hospitalized for one month in 1969.

The ALJ also had before him the report of Dr. S. Pearce Browning, who examined Bergeron in 1988. Browning opined that the spondylolisthesis and spondylolysis conditions both predated Bergeron's employment at General Dynamics in 1981. He concluded that the preexisting spondylolisthesis combined with the April 1985 injury "to produce an injury that is materially and substantially worse than would have occurred without the existence of the underlying disease."

The ALJ found that Bergeron had reached maximum medical improvement in March 1986 and was permanently totally disabled. In addition, the ALJ held that General Dynamics qualified for the statutory limitation of liability under section 8(f) because Bergeron had a preexisting permanent partial disability, because the previous disability was manifest to the employer through a pre-employment physical questionnaire, and because the current disability was the result of the combination of the preexisting conditions and the April 1985 injury.

The Board, in an unpublished opinion, affirmed the ALJ's ruling. It rejected the Director's contention that Bergeron's condition was not sufficiently serious and lasting to qualify as a preexisting permanent partial disability even though the injury had been asymptomatic for sixteen years, during which time Bergeron worked as a heavy laborer. The Board also agreed with the ALJ that the proper standard for assessing the significance of the prior disability in relation to the current disability is whether the evidence establishes that "claimant's disability is due to a combination of his preexisting condition and subsequent work injury."

## DISCUSSION

### I. *Statutory background*

The Act is a workers' compensation statute fixing disability benefits for maritime workers injured on the job. Under the so-

called "aggravation rule," an employer is liable for the worker's entire disability even though the disability was the result of the current employment injury and a preexisting impairment. *Krotsis*, 900 F.2d at 508. To diminish an employer's incentive to discriminate against handicapped workers because it fears increased liability under the aggravation rule, Congress enacted section 8(f) to limit the compensation liability of employers who hire a partially disabled person. *Id.* at 508–09. After the employer makes compensation payments for a specified period of time, the remaining payments are made by a special fund, created pursuant to section 44 of the Act, 33 U.S.C. § 944 (1988).

To obtain the benefit of section 8(f), an employer must show that (1) "the employee had a pre-existing permanent partial disability," (2) "this disability was manifest to the employer prior to the subsequent injury," and (3) the "subsequent injury *alone* would not have caused the claimant's total permanent disability." *Director, Office of Workers' Compensation Programs v. Luccitelli*, 964 F.2d 1303, 1305, 1306 (2d Cir. 1992) (emphasis in original). The challenges made by the Director on this petition for review relate to the first and third requirements.

## II. *The first requirement—preexisting disability*

An employer may obtain relief under the statute only if the employee has an "existing permanent partial disability." 33 U.S.C. § 908(f); *see also* 20 C.F.R. §§ 702.144–.145 (1992). The Board, citing *C & P Telephone Co. v. Director, Office of Workers' Compensation Programs*, 564 F.2d 503 (D.C.Cir.1977) ("*C & P*"), found that Bergeron's "prior back problems were sufficiently serious and lasting to constitute a pre-existing permanent partial disability." In *C & P*, the D.C. Circuit ruled that an existing permanent partial disability may be found where "the employee had such a

serious physical disability in fact that a cautious employer would have been motivated to discharge [or to decline to hire] the handicapped employee because of a greatly increased risk of employment-related accident and compensation liability." *Id.* at 513.

The Director asserts that the Board incorrectly interpreted *C & P* and established a *per se* rule that any existing condition is sufficient to constitute an "existing permanent partial disability." The Director urges a different interpretation of this phrase, which we discuss below, based on his reading of the test announced by the Court in *C & P*. He also urges us to defer to his interpretation. In two recent decisions, we have found it unnecessary to determine whether our previously expressed unwillingness to defer to the Director's interpretation of the Act has survived the latest teaching from the Supreme Court. *See Insurance Company of North America v. United States Department of Labor, Office of Workers' Compensation Programs*, 969 F.2d 1400, 1404 (2d Cir. 1992), *cert. filed*, No. 92–730 (Oct. 13, 1992); *Luccitelli*, 964 F.2d at 1306 n. 1. The current controversy obliges us now to face that issue.

### A. Deference to the Director

In *Krotsis*, we declined to give special deference to the Director's interpretation, as opposed to the Board's, because Congress had divided responsibility for administering the Act between these two arms of the Department of Labor. 900 F.2d at 510 (citing *Director, Office of Workers' Compensation Programs v. O'Keefe*, 545 F.2d 337 (3d Cir.1976)).[1] Furthermore, we noted that it would be inappropriate to give special deference to the Director's litigating position before the Board, particularly when it has not been articulated more definitively through regulations, because

---

**1.** The Third Circuit noted that while the Director was responsible for administering the Act, he did not resolve disputed legal issues under the Act. If, after informal conferences, the parties had not reached an agreement, the case was referred to an ALJ and, on appeal, to the Board. Thus, "[s]ubstantial questions of law arising in an adversarial context" were reserved for decision by the Board. 545 F.2d at 343.

such deference would risk depriving claimants of impartial review. *Id.*

Since our holding in *Krotsis*, the Supreme Court has decided three cases that bear on the deference issue. In *Martin v. Occupational Safety and Health Review Commission,* —— U.S. ——, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991), the Court faced the question whether, in interpreting an ambiguous regulation promulgated by the Secretary of Labor under the Occupational Safety and Health Act ("the OSH Act"), it should defer to the Secretary or to the independent Occupational Safety and Health Review Commission ("OSHRC"). The Secretary is responsible for setting and enforcing standards under the OSH Act, while OSHRC adjudicates disputes that arise under the statute. *Id.,* —— U.S. at ——, 111 S.Ct. at 1174.

The Court inferred from the structure and history of the OSH Act that the power to interpret regulations implementing this statute is a necessary adjunct to the Secretary's power to promulgate and enforce safety standards. *Id.,* —— U.S. at ——, 111 S.Ct. at 1176. Because the Secretary promulgates the regulations and can more easily reconstruct their purposes and because she comes into contact with many more cases than OSHRC through her role as enforcer, the Secretary has greater expertise and her interpretation is entitled to deference.[2] *Id.,* —— U.S. at —— –– ——, 111 S.Ct. at 1176–77. The Court indicated that OSHRC's purpose is to exercise non-policy-making adjudicatory powers, like a court in the agency review context, determining only if the Secretary's interpretation is reasonable. *Id.,* —— U.S. at ——, 111 S.Ct. at 1178.

Moreover, the Court rejected the argument that the Secretary's interpretation was a mere litigating position not entitled to deference. The Court indicated that litigating positions do not deserve deference if they are *post hoc* rationalizations for agency action advanced for the first time before a reviewing court. However, the Secretary's interpretation of regulations in an administrative action was itself viewed as agency action and was deemed as much an exercise of lawmaking powers as the promulgation of regulations. *Id.,* —— U.S. at ——, 111 S.Ct. at 1179. Protection against biased interpretations is achieved through review by OSHRC and the appellate court to assure that the Secretary's interpretations are reasonable. *Id.,* —— U.S. at ——, 111 S.Ct. at 1178–79. Thus, the Secretary's interpretation of her own regulation through a litigating position is entitled to deference if it is reasonable; the evaluation of its reasonableness, however, may be influenced by the fact that it was first announced as a litigating position. *Id.,* —— U.S. at ——, 111 S.Ct. at 1180.

In the second decision relevant to our discussion, *Pauley v. BethEnergy Mines, Inc.,* —— U.S. ——, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991), the Supreme Court deferred to the Secretary of Labor's interpretation that her regulations under the Black Lung Benefits Reform Act were not more restrictive than those previously issued by the Secretary of the former Department of Health, Education and Welfare ("HEW") as required by statute. The Court reasoned that, by delegating to the Secretary of Labor the authority to promulgate regulations less restrictive than those of HEW, Congress intended to give the Secretary broad discretion in interpreting the HEW regulations and in promulgating her own regulations based on her reasonable interpretation of the HEW regulations. *Id.,* —— U.S. at —— –– ——, 111 S.Ct. at 2534–35. The Court also found persuasive the fact that the Secretary's position had remained consistent. *Id.,* —— U.S. at ——, 111 S.Ct. at 2535.

Finally, in *Estate of Cowart v. Nicklos Drilling Co.,* —— U.S. ——, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992), the Court faced a situation in which the Director had agreed with the employee's and the Board's interpretation of the Act before changing his position to support the employer once the case reached the Supreme Court. The Court did not rule on whether the Di-

---

**2.** *Martin* overruled our determination in *Marshall v. Western Electric, Inc.,* 565 F.2d 240, 244 (2d Cir.1977), that OSHRC's interpretation deserved deference.

rector's new position was entitled to deference because the Director requested only that the Court find the statutory language to be plainly contrary to the Director's old interpretation still maintained by the Board. *Id.,* —— U.S. at ——, 111 S.Ct. at 2594–95. Implicit in the Court's discussion of the difficult issues that would be presented if the Director had asked the Court to defer to his new position was that the Court *would* defer to the Director's interpretation, as the policymaking agency, if it was reasonable and if the Director had not changed his position during the course of the litigation. *Id.,* —— U.S. at —— – ——, —— – ——, 111 S.Ct. at 2594–95, 2596–97.

■ Based on the intervening Supreme Court opinions, we are compelled to revise our approach to deference as expressed in *Krotsis* and will, in the future, defer to the Director's reasonable interpretations of the Act.[3] *Krotsis* was based on two rationales. First, we found that it was inappropriate to defer to a position developed in the course of adjudication. This contention was squarely rejected by the Supreme Court in *Martin.* The fact that a position is newly announced by the rulemaking authority in a litigation does not mean the position does not warrant deference; it may, however, be considered in our determination of the reasonableness of the position.

Second, we noted that Congress had divided responsibility for administering the Act between the Director and the Board, both offices of the Department of Labor. Before *Krotsis,* the Supreme Court held that no deference was due to the Board because it is not a policy-making agency. *Potomac Electric Power Co. v. Director, Office of Workers' Compensation Programs,* 449 U.S. 268, 278 n. 18, 101 S.Ct. 509, 514 n. 18, 66 L.Ed.2d 446 (1980). Because of the split in responsibility, we decided that the Director was not entitled to deference either.

When the responsibility for administering an act has been split, the Supreme Court has directed us to defer to the office that has the policy-making authority. Congress delegated to the Secretary of Labor the power to prescribe rules and regulations under the Act. 33 U.S.C. § 939(a) (1988). In turn, the Secretary set up the Office of Workers' Compensation Programs, the head of which is the Director. 20 C.F.R. § 701.201 (1992). The Secretary delegated to this Office "all functions of the Department of Labor with respect to the administration of benefits programs" under the Act, 20 C.F.R. § 701.202 (1992), and designated the Director to represent her in all review proceedings, 20 C.F.R. § 802.410(b) (1992). Thus, the Director, as the policy-making authority, is to be accorded deference.

B. Reasonableness of the Director's interpretation

■ An analysis of the reasoning underlying the Court's opinion in *C & P* is a useful starting point for our determination of the reasonableness of the Director's view of section 8(f). In *C & P,* the D.C. Circuit was faced with the issue whether the term disability under section 8(f) is limited to an economic concept. "Disability" is defined in the statute as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." 33 U.S.C. § 902(10) (1988). Furthermore, section 8(c) of the Act, 33 U.S.C. § 908(c) (1988), uses the term "permanent partial disability" and lists the compensation schedule for the loss of, or loss of use of, specified body parts, § 8(c)(1)–(19), or for disfigurement, § 8(c)(20), irrespective of the loss of wage-earning capacity. In addition, this subsection includes a provision that describes the calculation of compensation for "other cases" based on the decrease in the employee's wage-earning capacity, § 8(c)(21).

The D.C. Circuit found that if it limited the term "disability" to an economic concept, the congressional purpose of section 8(f) would be frustrated by leaving many employees with physical disabilities unpro-

---

3. This opinion has been circulated to all of the     active judges of this Court prior to filing.

tected. *C & P*, 564 F.2d at 512–13.[4] After a careful analysis of the statute at issue, its legislative history, Supreme Court precedent, and relevant commentary, the D.C. Circuit concluded that the purpose of the provision was to prevent discrimination in the hiring of handicapped workers because an employer feared burdensome compensation liability if the worker became injured on the job. *See id.* at 510–12. This fear could reasonably exist even if the employee was not economically disabled or was not missing a body part when hired as long as "[b]y virtue of the contribution of the previous partial disability, such a worker injured on the job may suffer a resulting disability greater than a healthy worker would have suffered." *Id.* at 512. Thus, *C & P* found that the term "disability" as used in section 8(f) could mean either economic disability, or a condition described in the scheduled items in section 8(c), or a physical disability that would motivate a cautious employer to discriminate against a handicapped employee for fear of increased liability for compensation. *See id.* at 513.

With this understanding of the *C & P* decision, we must determine whether the Director's interpretation of section 8(f) is reasonable. One of the difficulties created by the Supreme Court's instruction that we defer to the Director's litigating position is that we must extract that position from the Director's submissions, instead of seeing it clearly set forth in a regulation or other statement of policy. It is unclear whether the Director is asking us to defer to the *C & P* standard as expressed in that decision, in which the seriousness of the preexisting condition is a factor in deciding whether the employer's fear of future compensation liability is objectively reasonable, or whether he considers the test to include two independent factors. Under a bifurcated standard, there would be two elements: (1) whether the employee has a serious preexisting physical disability, and (2) whether a cautious employer would discriminate based on this disability for fear of in-

creased liability. The difference between the two readings is that, under the latter, the seriousness of the disability would have to be measured on some scale independent of the effect of the disability on the mind of a reasonable employer.

We believe that the use of a bifurcated standard would raise a serious question as to whether the purpose of the statute was being achieved, since such a standard might deny the benefit of limited liability to an employer who hired despite a reasonable apprehension of increased compensation liability but could not satisfy an independent criterion of a preexisting condition of sufficient gravity. Thus, we will presume that the Director is requesting that we defer to his reliance on the *C & P* test as expressed in that decision. Applying the deference analysis of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we hold that the Director's interpretation of the phrase "existing permanent partial disability" is reasonable because it implements the congressional purpose to limit the incentive of employers, created by the aggravation rule, to discriminate against handicapped employees. Under the Director's interpretation, employers who reasonably fear increased liability when they hire a handicapped worker will receive the benefit of a statutory limitation on liability. The employee will receive the full amount to which he is entitled because the special fund created by Congress will make the payments that the employer has been spared.

▋ The Director further requests us to hold, either as a matter of law or in deference to his litigating position, that Bergeron's preexisting condition could not have created a fear of increased liability in the mind of a reasonably cautious employer. In support, the Director points to the facts that Bergeron admitted that his 1969 back injury had fully healed and that he experienced no back pain until the 1985 injury,

---

**4.** The Supreme Court has held, in another context, that the word "disability" was not used as a term of art in section 8(f)(1), and its meaning should not be read in a mechanical fashion if such a reading would frustrate the purpose of Congress. *Lawson v. Suwannee Fruit & Steamship Co.*, 336 U.S. 198, 201, 206, 69 S.Ct. 503, 504–05, 507, 93 L.Ed. 611 (1949).

even though his job duties continually required the moving and carrying of heavy objects. The Director also notes that General Dynamics concluded that Bergeron's back was "normal" in his pre-employment physical.

Although this evidence suggests that General Dynamics' fear, if any, of increased compensation liability for Bergeron was unreasonable at the time it hired him in 1981, we cannot decide this question as a matter of law. We can imagine a situation in which an asymptomatic condition, not physically impairing the employee in any way, leaves him more susceptible in the future to a serious injury than a completely healthy employee, such that a prospective employer would discriminate against the applicant. Such discrimination would be contrary to the congressional purpose in enacting section 8(f). *But see CNA Insurance Co. v. Legrow*, 935 F.2d 430, 436 (1st Cir.1991) (upholding Board's reversal of ALJ ruling that employee had an existing permanent partial disability where employee had returned to regular physical work duties, without medical restrictions or medication, after recovering from back injuries).

■ Furthermore, we do not believe that the deference we are to accord the Director extends beyond his reasonable interpretation of a statute's meaning and applies to every instance of a statute's application to particular facts. If we were to defer to the Director at this level of specificity, the function of the Board would be limited simply to finding facts. The Board would then be compelled to reach whatever outcome, based on those findings, that the Director requested. Such a limited role is contrary to the view espoused by the Supreme Court in *OSHRC.* As the Supreme Court there observed, "[O]f course, Congress expressly charged the Commission [here, the Board] with making authoritative findings of fact *and with applying the Secretary's [here, the Director's] standards to those facts in making a decision.*" —— U.S. at ——, 111 S.Ct. at 1178 (emphasis added). Requiring deference to the Director's specific application of his

general standard to the facts presented in an individual case would go too far in usurping the role allocated to the Board.

In sum, the ALJ must reconsider the evidence in light of the Director's interpretation of the phrase "existing permanent partial disability" as set forth in the opinion by the D.C. Circuit in *C & P.* Specifically, the ALJ cannot find that Bergeron had such a disability simply because he had previously injured his back and has a back condition. Instead, the ALJ must determine whether "the employee had such a serious physical disability in fact that a cautious employer would have been motivated to discharge [or to decline to hire] the handicapped employee because of a greatly increased risk of employment-related accident and compensation liability." *C & P,* 564 F.2d at 513. In making this determination, the ALJ is not bound by the Director's view that a back condition that is asymptomatic for a period of twelve years, the time period between when Bergeron last injured his back and when he was hired by General Dynamics, and that did not in any way impair the employee's ability to perform his job functions cannot satisfy this test. Furthermore, the ALJ may, in his discretion, permit the parties to introduce evidence on the relevant issue, including whether a person with the back conditions from which Bergeron suffers is significantly more likely to sustain a serious injury than a person without these conditions.

III. *The third requirement—effect of subsequent injury*

■ We pointed out in *Luccitelli*, decided after the Board's decision in this case, that an employer seeking the benefit of section 8(f) must establish that the "subsequent injury *alone* would not have caused the claimant's total permanent disability." *Luccitelli*, 964 F.2d at 1306 (emphasis in original). In the pending case, the Board has repeated its error of *Luccitelli* by permitting the employer to meet the third requirement of section 8(f) merely by showing that the preexisting condition made the disability worse than it would have been with only the subsequent injury.

The section 8(f) relief provision was not intended to create a windfall for any employer that hires a disabled worker by limiting its liability even when the later injury itself would have permanently and totally disabled the employee. As we noted in *Luccitelli*, in words equally applicable here, "If the later [back] injury alone was enough to totally disable [Bergeron], it should be irrelevant that his pre-existing [back] injury made his total disability even greater." *Id.* at 1305–06. Thus, on remand, General Dynamics must produce evidence that Bergeron would not have been permanently and totally disabled solely by reason of the April 21, 1985, injury.

## CONCLUSION

We vacate the decision of the Board and remand the case for further proceedings consistent with this opinion.