NEW HAVEN TERMINAL CORP.,
and Liberty Mutual Insurance
Co., Petitioners,

v.

Richard LAKE and Director, Office of
Workers' Compensation Programs,
U.S. Dept. of Labor, Respondents.

Docket No. 01–4005.

United States Court of Appeals,
Second Circuit.

Argued Dec. 6, 2002.

Decided July 21, 2003.

Thomas C. Fitzhugh, III (Matthew H. Ammerman, on the brief), Fitzhugh & Elliott, P.C., Houston, TX, for Petitioners.

David A. Kelly, Montstream & May, Glastonbury, CT, for Respondent Richard Lake.

Joshua T. Gillelan, II, U.S. Dept. of Labor, Washington, D.C., for Respondent OWCP.

Before: WALKER, Chief Judge,
OAKES and RAGGI, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

Petitioners New Haven Terminal Corp. ("New Haven Terminal") and its insurer, Liberty Mutual Insurance Co., appeal from the judgment of the Benefits Review Board of the United States Department of Labor ("BRB") that reversed in part the decision of the administrative law judge("ALJ") and granted workers' compensation benefits to respondent Richard Lake. After the ALJ had approved a settlement between Lake and New Haven Terminal's successor, Logistec of Connecticut, Inc. ("Logistec"), to compensate Lake for lost wages due to a 1997 injury, the ALJ reviewed Lake's claims against New Haven Terminal for lost wages due to a 1993 injury, which he claimed left him permanently partially disabled.

The ALJ found that New Haven Terminal owed Lake compensation from 1993 to 1997, but not after 1997, because Lake's current disabilities are due to the injury he suffered in 1997 while working for Logistec. To the extent that the 1997 injury may have aggravated the 1993 injury, the ALJ explained that under the "aggravation rule," the employer at the time of the latter injury is liable for the entire resulting disability, and thus Logistec, and not New Haven Terminal, was liable for any disability after the 1997 injury.

The BRB reversed the ALJ's decision to terminate New Haven Terminal's liability after 1997. We vacate the decisions below with respect to post–1997 compensation and remand for the ALJ to review the settlement and to determine New Haven Terminal's liability for Lake's disability post–1997.

## I. BACKGROUND

On February 17, 1993, Lake injured his back while he was working for New Haven Terminal as a longshoreman. He returned to work on February 1, 1994, as a field checker and light-duty laborer with lower weekly earnings. Sometime in 1996, Logistec assumed control of the operations of the New Haven and Bridgeport docks. On November 25, 1997, Lake had a physical altercation with his supervisor Marty Romano during a work-related argument and suffered a second back injury. The ALJ's decision portrays Romano as the aggressor, which neither party disputes. As of September 2000, Lake still was unable to work, and the record does not reveal when, if at all, he resumed working and at what wages.

Lake claimed disability and medical benefits against New Haven Terminal and Logistec under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–950. On June 8, 1999, Lake settled his claims with Logistec for $30,000 in compensation and $8,059.47 for attorney's fees and expenses. The settlement was premised upon a weekly wage of $629.32 before Lake's 1997 injury. The ALJ approved the settlement on July 7, 1999.

On August 2, 1999, the ALJ found New Haven Terminal liable for Lake's lost earnings between 1993 and 1997, but not thereafter. The parties had stipulated that Lake had been earning $782.82 per week before the 1993 injury, and the ALJ found that Lake's post-injury wage earning capacity was $489.79. There is no explanation in the record for the discrepancy between Lake's stipulated post–1993–injury wage earning capacity of $489.79 and the settlement's premised weekly wage of $629.32 before the 1997 injury. The difference between the stipulated pre-injury weekly wage ($782.82) and the post-injury weekly wage ($489.79) was $293.03. Under the LHWCA, a claimant suffering a permanent partial disability is compensated at a rate of two-thirds of the pre-injury and post-injury difference, which in this case was $195.35 (correcting the ALJ's math error). 33 U.S.C. § 908(c)(21); 33 U.S.C. § 908(h). The ALJ granted compensation for both Lake's temporary total and permanent total disability in the months after the 1993 injury, and his permanent partial disability from February 1, 1994, when he returned to work, to November 24, 1997, the date of the second injury.

The ALJ ruled that New Haven Terminal was not liable after November 24, 1997, because Lake's present disability "is due solely to his November 25, 1997 physical altercation and confrontation with his supervisor." *Lake v. New Haven Terminal Corp.*, 1998–LHC–2649, OWCP No. 1–33110, at 43 (Aug. 2, 1999). The ALJ first explained that the altercation was "an in-

tervening cause which is attributable only to [Lake's] own subsequent conduct and which broke the chain of causality between [Lake's] 1993 injury and his present condition." *Id.* at 51. This conclusion incorporated elements of fault and contributory negligence as a basis for rejecting Lake's claim. Second, the ALJ found that Lake "had completely recovered" from the 1993 injury when the 1997 injury occurred. *Id.* at 52. Third, the ALJ also found, somewhat inconsistently, that the second injury aggravated the first, and he ruled that under the "aggravation rule," to the extent Lake suffered an injury that aggravated a pre-existing condition, Lake may collect benefits for the total resulting injury only from the last employer, Logistec. *See id.* at 52 (citing *Found. Constructors v. Dir., Office of Workers' Comp. Programs,* 950 F.2d 621, 624 (9th Cir.1991)). Thus the ALJ exonerated New Haven Terminal from any liability based upon the 1997 injury.

The BRB reversed the ALJ's holding to the extent that it exempted New Haven Terminal from liability after November 24, 1997, and extended that liability indefinitely for Lake's permanent partial disability. *See Lake v. New Haven Terminal Corp.,* BRB No. 99–1253, at 5 (Sept. 8, 2000). First, the BRB ruled that the defense of intervening cause applies only to non-work-related events following an initial work injury, and that the LHWCA specifically excludes the consideration of fault in assessing the cause of the injury. *Id.* at 4 (citing 33 U.S.C. § 904(b) ("Compensation shall be payable irrespective of fault as a cause for the injury.")). Second, the BRB found "no evidence of record" to support the ALJ's finding that Lake's back injury had resolved before the 1997 injury or that the second injury "permanently exacerbated" the first, and thus held that New Haven Terminal continued to be liable for the effects of the first injury. *Id.* at 5.

Third, the BRB rejected the ALJ's application of the aggravation rule to place liability on Logistec, but did not address the question of whether a first employer may invoke the aggravation rule as a defense. *Id.* at 3. New Haven Terminal appeals from the BRB ruling.

## II. DISCUSSION

On appeal, New Haven Terminal argues that 1) the ALJ's finding that Lake had completely recovered from the 1993 injury was supported by substantial evidence; 2) under the aggravation rule, the last employer is liable for the entire disability post–1997 and thus this liability falls on Logistec and not New Haven Terminal; and 3) the Logistec settlement adequately compensated Lake for the entire disability resulting from the 1997 injury.

### A. Standard of Review

We review the BRB decision *de novo* for errors of law, and we uphold an administrative law judge's findings of fact if they are supported by substantial evidence. *Blanding v. Dir., OWCP,* 186 F.3d 232, 235 (2d Cir.1999); *see also O'Keeffe v. Smith, Hinchman and Grylls Assoc.,* 380 U.S. 359, 362, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a factual conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

### B. Evidence of Recovery from the 1993 Injury

New Haven Terminal argues that the BRB erred in rejecting the ALJ's conclusion that Lake had recovered completely from his 1993 back injury before the 1997 back injury, and that therefore New Haven Terminal was not liable for the

effects of the latter injury. We agree with the BRB that there was no substantial evidence supporting the ALJ's finding of complete recovery.

The ALJ relied primarily on Lake's failure to seek further medical treatment for his back between 1994 and November 1997. Although this conduct may raise some doubt about the severity of Lake's disability, it does not disprove its continued existence. It is as plausible that Lake simply adhered to his health restrictions in order to avoid pain and discomfort, and did not need further treatment. New Haven Terminal's further argument, that Lake was able to perform all of his assigned duties, is equally weak. When Lake returned to work after the injury in 1994, he switched from longshoreman, a position which required repeated heavy lifting, to field checker, a less demanding job that was tailored to accommodate his back problems. Lake's performance of these duties suggests no more than that the new position accommodated his disability, not that the disability resolved.

The ALJ's findings drew heavily upon a 1998 medical evaluation by Dr. Michael Saffir, to whom Lake was referred by Signal Mutual Insurance, Logistec's insurer. That evaluation, however, offers no support for the claim that Lake fully recovered from his back problems before 1997. Dr. Saffir noted Lake's "significant history of back pain and left sciatica," and suggested that the 1997 incident "could aggravate a lumbar strain and possibly subacute underlying radiculopathy." The ALJ points to Dr. Saffir's statement that Lake "recovered with rest and medication using Motrin." In context, the word "recovered" referred to Lake's physical condition in 1998 and his recovery from the 1997 injury, not the 1993 injury. Given that Dr. Saffir found that Lake was still disabled, the recovery plainly refers not to a full recovery of his back, but to an alleviation of pain in 1998 that permitted Lake to function. The ALJ also mentions Dr. Saffir's statement that Lake "improved with conservative treatment" after the 1993 injury, and that Lake "apparently did fairly well with regular activities" before 1997, but improvement does not equate with recovery. Dr. Saffir's reference to "regular activities" also does not indicate an ability to return to work as a longshoreman with its heavy lifting requirements.

In pressing its argument that the second employer is responsible for any aggravation of a prior injury, New Haven Terminal takes the somewhat inconsistent position that the 1997 injury exacerbated the 1993 injury, implicitly acknowledging that the 1993 injury was not resolved. New Haven Terminal cites Dr. Saffir's opinion that "[i]t is possible that [his 1997 injury] could aggravate a lumbar strain and possible subacute underlying radiculopathy," which resulted from the 1993 injury.

New Haven Terminal also presents an economic argument that the 1993 injury did not cause Lake's disability. Under the LHWCA, the evaluation of disability is both medical and economic. See *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1041 (2d Cir.1997) ("Because disability under the Act is an economic concept, the extent of disability cannot be measured by medical condition alone."). New Haven Terminal argues that Lake was not disabled in economic terms because, when Lake returned to work in 1994, he switched positions from heavy-lifting longshoreman to field checker, which had a higher hourly wage. However, this argument disregards that Lake's earlier position offered lucrative overtime pay, which accounted for his higher weekly wage despite a lower hourly wage. New Haven Terminal also contends that Lake's diminished earnings were due to Logistec's

pay cuts, and not to the 1993 back injury. However, Lake provided evidence of economic disability after 1993 in a comparative method that accounts for pay cuts. The wages of Joseph Russo, a comparable worker employed in the position Lake would have held but for his injury, were greater than those of Lake after 1993. New Haven Terminal does not contend that this comparison with Russo was, in any respect, unfair or misleading.

■ Lake has demonstrated sufficiently that he was partially disabled in medical and economic terms, but one might argue, although New Haven Terminal did not do so, that Lake's stipulated pre–1993 weekly wage of $782.82 does not accurately reflect what Lake's wages would be as time passed. First, although the wage cuts in 1996 probably would not have erased the difference between his pre and post–injury wages, they would have sharply reduced that difference. Second, Lake was approximately 55 years old at the time of the 1993 injury; as he aged, he probably would have cut back in overtime and might have opted to take advantage of his seniority to move into lighter work with slightly lower pay.

However, the LHWCA forecloses this economic argument. The statute defines disability as "incapacity because of injury to earn the wages which the employee was receiving at the time of the injury in the same or any other employment." 33 U.S.C. § 902(10). The statute then fixes compensation for such disability at two-thirds of "the difference between the average weekly wages of the employee and the employee's wage earning capacity thereafter." 33 U.S.C. § 908(c)(21). The LHWCA determines compensation by calculating the "average weekly wage ... at the time of the injury," and offers three different methods of calculation, each based on actual wages at the time of the injury. 33 U.S.C. § 910(a)-(c). The LHWCA does allow an upward adjustment in the post-injury "wage-earning capacity" figure if the "actual earnings do not fairly or reasonably represent his wage earning capacity." 33 U.S.C. § 908(h) (referring to the calculation under § 908(c)(21)), but it does not permit adjustments to pre-injury wages.

We can speculate that the statute focuses on the actual pre-injury wages because such a calculation is simpler and more efficient than creating actuarial tables, comparing similar workers over time, or factoring in wage cuts. In any event, the statute builds in a devaluation of the pre-injury earnings by one third. 33 U.S.C. § 908(c)(21). Whether this bright-line reduction undercompensates some workers and overcompensates others need not concern us. It is a legislative choice.

Under this statutory framework, Lake has demonstrated that in 1993 and again in 1997 he was disabled in physical and in economic terms due to work-related injuries. However, it is not clear from the evidence to what extent the 1993 injury contributed to Lake's current disability, a matter we discuss *infra*.

## C. The Last Employer Rule

### 1. The Last Employer Rule Is Not a Defense

■ New Haven Terminal argues that Logistec is solely responsible for Lake's disability benefits after the altercation on November 24, 1997, even for injuries that aggravated the 1993 injury. The aggravation rule, a branch of the last employer rule, assigns liability to the last employer in workers' compensation cases where a disability results from cumulative or multiple injuries. We announced the last employer rule in *Travelers Ins. Co. v. Cardillo*, in recognition of the practical

difficulties and delays in trying to apportion liability among several employers for cumulative work-related disabilities. *See* 225 F.2d 137, 144–45 (2d Cir.1955).

The last employer rule generally applies to occupational diseases, while the aggravation rule applies to multiple discrete and exacerbating injuries and is also known as the "two-injury" rule. *See Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs*, 244 F.3d 222, 228–30 (1st Cir.2001); *Found. Constructors*, 950 F.2d at 623–24. We have adopted the Fifth Circuit's formulation of the aggravation rule: "[W]here an employment injury worsens or combines with a preexisting impairment to produce a disability greater than that which would have resulted from the employment injury alone, the *entire* resulting disability is compensable." *Dir., Office of Workers' Comp. Programs v. General Dynamics Corp.* ("*Krotsis*"), 900 F.2d 506, 508 (2d Cir.1990) (overruled, in part, on other grounds by *Dir., Office of Workers' Comp. Programs v. General Dynamics Corp.*, 982 F.2d 790, 792–93 (2d Cir.1992)) (citing *Strachan Shipping Co. v. Nash*, 782 F.2d 513, 517 (5th Cir.1986)).

The aggravation rule is not a defense for first or earlier employers, but rather, an extension of liability that promotes administrative efficiency and guarantees full recovery for injured workers. As the Fifth Circuit elaborated in *Strachan*:

> The LHWCA represents a compromise by which the employee receives a much smaller recovery than he might receive in a tort action. At the same time, this reduced recovery is intended to be immediate, secure, and less expensive for the employee to obtain....

> This Court has noted repeatedly that the LHWCA is to be liberally construed in favor of injured employees and recovery by longshoremen. The aggravation rule, as applied by the BRB together with the credit doctrine, rests on this same "presumption of compensability grounded in the humanitarian nature of the [LHWCA]."

*Id.* at 518. Permitting the prior employer to use the aggravation rule as a defense to limit full recovery would frustrate the statute's goal of "complete recovery for injuries." *Id. Strachan* rejected an argument that because a claimant "*could have* or *should have* recovered" compensation for a disability at an earlier time, he would be "forever precluded from recovery for disability attributable to his initial injury." *Id.* at 517. "[S]uch limitations on employee recovery are not favored, absent *statutory* authority. Courts have consistently rejected any attempt to construe the LHWCA as requiring an employee to seek the maximum conceivable compensation from an employer or to forfeit thereafter recovery on a portion of his disability." *Id.* at 519 (internal citation omitted). There is no statutory authority for a previous employer to use the aggravation rule as a shield from liability.

The aggravation rule was fashioned by courts to promote the goals of the LHWCA, "to provide workers' compensation benefits which are easily, quickly, and routinely established." *Id.* at 520. As the *Strachan* court recognized, interpreting the LHWCA to limit recovery, because recovery could have been obtained from another employer under the aggravation rule, would "deter[ ] parties from settling claims under the LHWCA." *Id.* at 521.

Our precedents on the aggravation rule do not detract from *Strachan*'s interpretations of the LHWCA. These cases formulate the aggravation rule as an extension of liability and do not suggest its availability as a defense or that it immunizes the previous employers. *See Krotsis*, 900 F.2d

at 508 ("[T]he entire resulting disability is compensable.") (citing *Strachan,* 782 F.2d at 517); *Blanchette v. Office of Workers' Comp. Programs,* 998 F.2d 109, 112 (2d Cir.1993) (same); *see also Dir., Office of Workers' Comp. Programs v. Luccitelli,* 964 F.2d 1303, 1304 (2d Cir.1992); *General Dynamics Corp.,* 982 F.2d at 792–93. New Haven Terminal purports to embrace *Strachan*'s goal of a "single complete recovery" in its briefs, but its interpretation of the aggravation rule as a defense is inconsistent with that goal.

 Nothing we say diminishes the applicability of the credit doctrine as a limitation on the aggravation rule. The credit doctrine is "an extra-statutory doctrine developed by the [BRB] to prevent double recoveries when a worker has already been compensated for an existing disability." *Blanchette,* 998 F.2d at 113 (citing *Krotsis,* 900 F.2d at 509). Under the credit doctrine, any compensation due for an aggravated injury is subject to an offset or credit for compensation already received from someone else for the same injury. *Id.* This rule generally serves to reduce a last employer's compensation by the amount of prior compensation paid by an earlier employer for the aggravated injury, but the credit doctrine also applies equally to reduce the compensation due from an earlier employer by the compensation received from the last employer for the injury.

### 2. Compensation from an Earlier Employer

 Wherever possible, a claimant should collect compensation for aggravated injuries from the last employer. However, in order to promote the goals of complete recovery and to encourage settlements, but without allowing claimant to manipulate settlements to win double recoveries, a claimant may still recover from an earlier employer when he or she cannot recover from the last employer.

 In a standard LHWCA claim, once a claimant has demonstrated that he sustained a loss of earning capacity and thus was disabled as defined by the statute, the burden of proof shifts to the employer to demonstrate that there is no disability and to demonstrate alternative suitable employment opportunities. *Palombo v. Dir., Office of Workers' Comp. Programs,* 937 F.2d 70, 73 (2d Cir.1991). However, this is not a standard LHWCA claim. Lake bears a burden of showing that his current disability is attributable to the first injury because that first injury is less proximate and the causal link cannot be presumed. Although the ALJ misapplied intervening cause in his opinion, an issue remains in the case that is similar to the intervening cause doctrine: The second injury intervenes and obscures the extent of the first injury's effect on his permanent disability. Lake provides extensive evidence of a lower earning capacity, and the medical evaluations after 1997 suggest that Lake's second injury may have exacerbated the first, but the evidence does not address how much the earlier injury contributed to his current condition. Of course, this question of causation is abstract and the contribution of an earlier injury is difficult to measure. Nevertheless, on remand, the ALJ should address specifically whether, and estimate to what extent, the first injury contributed to the second.

 When a claimant cannot recover from the last employer because of a settlement, we will permit recovery from an earlier employer where the claimant has acted in good faith and has not manipulated the aggravation rule. On remand, the ALJ should examine Lake's settlement with Logistec and first determine whether there is a credible explanation, substantial-

ly supported by the evidence, for Lake to accept the partial settlement and not to pursue complete recovery through the last employer rule. Our concern is that a last employer, such as Logistec, may offer an inflated award that overcompensates a claimant for the damages due proportionately to the last injury, so that the claimant will not take advantage of the last employer rule for the earlier injury and instead seek the rest of the compensation from an earlier employer, such as New Haven Terminal. Because the aggravation rule must be defended against such manipulation, an ALJ should inquire whether Lake's explanation for the settlement is credible, and if not, should reject Lake's claim against New Haven Terminal. On remand, New Haven Terminal is free to argue that the Logistec settlement contemplated total compensation for the aggravated injury.

At oral argument, Lake's counsel offered a plausible rationale for the settlement that was reached in 1999: He believed that the ALJ might have ruled that the 1997 injury during Lake's work for Logistec caused only a temporary total disability that prevented Lake from working for a period of time. At the end of that time, the effect of the second injury may have dissipated, and Lake's permanent partial disability would have been attributable solely to the first injury; and thus, the ALJ would find that Logistec was not liable for Lake's permanent partial disability. Thus, the settlement of $30,000 represented compensation for Lake's temporary total disability from November 24, 1997. On its face, this explanation strikes us as plausible, but we cannot determine from the record whether it is supported by the evidence. We leave its evaluation to the ALJ on remand.

We also cannot determine whether the settlement overcompensated Lake for the damages due to the 1997 injury while working for Logistec. It is certainly possible that $30,000 undercompensated Lake if the second injury prevented him from returning to work longer than they had anticipated in the settlement, but we have no record of when (or if) Lake returned to work. One confusing aspect of the settlement is that it states that Lake's "applicable weekly wage" prior to the 1997 injury was $629.32. After approving this settlement, the ALJ issued his final decision finding that Lake's wage-earning capacity after the 1993 injury was $489.79. The higher pre–1997–injury wage in the settlement justifies a larger settlement, and the lower post–1993–injury wage in the ALJ's decision justifies greater compensation. This discrepancy may be attributable to valid administrative calculations or to an error by the ALJ. However, our concern is that this discrepancy may have inflated both the settlement with Logistec and the claim here against New Haven Terminal. The ALJ, applying the credit doctrine, should determine whether the settlement overcompensates Lake for Logistec's share of the liability, and then credit any overcompensation to New Haven Terminal's liability. If the settlement undercompensates for Logistec's share of the liability, New Haven Terminal is responsible only for its own share of the liability, and not for Logistec's. Additionally, if New Haven Terminal owes Lake compensation for a portion of the aggravated injury, it is eligible for the special fund established under 33 U.S.C. § 944 pursuant to the guidelines under § 908(f).[1]

---

**1.** Section 944 establishes a public "special fund" for compensating injured workers, with employers paying into the fund based on a prorated formula. 33 U.S.C. § 944(c). When an injury "increases" or aggravates disability, an employer pays compensation for a pre-

## D. The Settlement's Coverage

Finally, New Haven Terminal claims that the ALJ found that the settlement with Logistec adequately compensated Lake for the entire disability resulting from the 1997 injury. New Haven Terminal cites the ALJ's finding that Lake "is not entitled to any additional benefits" and that the "settlement was fair, reasonable, and adequate." However, these findings were premised on the ALJ's erroneous determination that New Haven Terminal was not liable for the post–1997 disability because of the doctrines of fault and intervening cause, the aggravation rule, and the evidence of Lake's recovery. On remand, the ALJ must return to the question of whether New Haven Terminal is liable for the post–1997 disability.

For the foregoing reasons, we vacate the BRB's judgment that New Haven Terminal is liable for Lake's post–1997 disability, and we remand to the BRB for it to vacate the ALJ's decision insofar as it found that New Haven Terminal was not liable for Lake's post–1997 disability, and for it to remand the case to the ALJ for a determination of whether the settlement with Logistec overcompensated Lake in order to bypass the last employer rule; a determination of whether, and to what extent, Lake's 1993 injury contributed to his current disability; and a calculation of appropriate compensation.

## III. CONCLUSION

The judgment of the BRB is VACATED and REMANDED.

scribed number of weeks; thereafter the employee receives the remainder of the benefits from the special fund as long as the employer has been contributing to the fund in compliance with the rules; otherwise the employer remains liable. 33 U.S.C. § 908(f)(2)(A). For an aggravated permanent partial disability, which is what Lake claims to have, the last employer would pay the claim for two years before the fund payments begin. 33 U.S.C. § 908(f)(1).

Although the fund is principally designed to benefit last employers, previous employers who compensate aggravating injuries also qualify. The section uses the term "employer" in general, and the definition section states: "The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States." 33 U.S.C. § 902(4). This applies to last employers and earlier employers. Employers qualify for special funds when they have paid compensation "[i]n any case in which an employee having an existing permanent partial disability suffers injury." 33 U.S.C. § 908(f)(1). Of course, the normal use of the fund is for last employers, but nothing in the statute precludes earlier employers from using the fund if they were held responsible to compensate an employee with an existing permanent partial disability who suffers an aggravating injury.