09-4976-ag
Dyncorp v. Dir., OWCP

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

August Term, 2010

(Submitted: February 11, 2011    Decided: September 2, 2011    Amended: September 7, 2011)

Docket No. 09-4976-ag

———————————

DYNCORP INTERNATIONAL, FIDELITY & CASUALTY COMPANY OF NEW YORK/CNA
INTERNATIONAL,

*Petitioners*,

— v.—

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF
LABOR, ELIZABETH A. MECHLER,

*Respondents*.

———————————

Before:

POOLER, HALL, *Circuit Judges*, and COGAN, *District Judge*.[*]

———————————

Petitioners Dyncorp International and Fidelity & Casualty Company of New York/CNA

International appeal the decision and order of the Department of Labor Benefits Review Board

reversing the Administrative Law Judge's dismissal of respondent Elizabeth Mechler's claim for

---

[*] The Honorable Brian M. Cogan, of the United States District Court for the Southern District of
New York, sitting by designation.

benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-50, as extended by the Defense Base Act, 42 U.S.C. §§ 1651-54, as untimely. The Board determined that the ALJ's principle finding on the issue of timeliness was not supported by substantial evidence. We agree and, accordingly, **affirm** the Board's order.

AFFIRMED.

_____

MICHAEL W. THOMAS, Thomas, Quinn & Krieger, LLP, San Francisco, CA, *for Petitioners*.

DAVID C. BARNETT, Barnett & Lerner, P.A., Fort Lauderdale, FL (Joshua T. Gillelan II, of counsel, Longshore Claimants's Nat'l Law Center, *on the brief*), *for Respondents*.

_____

*Per Curiam*:

Petitioners Dyncorp International and Fidelity & Casualty Company of New York/CNA International appeal the decision and order of the Department of Labor Benefits Review Board reversing the Administrative Law Judge's dismissal of respondent Elizabeth Mechler's claim for benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-50, as extended by the Defense Base Act, 42 U.S.C. §§ 1651-54, as untimely. The Board determined that the ALJ's principal finding on the issue of timeliness was not supported by substantial evidence. We agree and, accordingly, **affirm** the Board's order.

**Background**

From 1993 through 2004, Mechler worked as a special enforcement officer for the Kansas Department of Corrections ("DOC"). Her primary responsibility in this role was apprehending fugitive parolees, and at various points in time she was assigned to work with the

2

United States Marshal's Fugitive Task Force. This type of work required Mechler to carry with her a firearm. In March 2004, Mechler left the Kansas DOC to begin a three year contract with Dyncorp, which operated various overseas prisons on behalf of the United States government. Mechler was assigned to the Mitrovica Detention Center in Kosovo, where, on April 17, 2004—her first day on the job—she and five other Dyncorp employees were shot by a Jordanian soldier working for the United Nations. Three of the victims died.

Mechler was wounded in her left leg and pelvis, but, after treatment at a military hospital, returned to work on crutches two days after the attack. Because of her physical injuries Dyncorp assigned Mechler to light duty, where she remained until January 2005. Even on light duty, however, Mechler struggled to complete her 8-12 hour shifts. For her first two weeks back on the job, her colleagues would sometimes complete her shifts for her. They also would occasionally cover for her when, beginning about four weeks after the shooting, Mechler would attend bi-monthly counseling sessions with an army psychologist, Captain Cora Courage. At the time, Mechler was experiencing trouble sleeping, intrusive thoughts, and anxiety. To treat the anxiety and sleeplessness, Captain Courage referred Mechler to an Army psychiatrist, Colonel McClure, who prescribed Mechler Zoloft and Trazodone. The sleeping medication, Trazodone, apparently needed to be taken at a consistent time of day, so Colonel McClure recommended that Mechler stop alternating between day and night shifts at Dyncorp. To accommodate this, Dyncorp transferred Mechler to a different prison where she no longer had to work nights.

Around August 2004, Dyncorp brought one of its employees, Dr. Paul Brand, to Kosovo to administer psychological examinations to all the shooting survivors. Although Mechler testified that she believed Brand was retained to gauge the survivors' mental fitness, the timing

3

of his visit seems to coincide roughly with contact between Kurt Kerns, a Kansas lawyer, and the survivors. Kerns was contemplating a law suit against the Jordanian government and possibly the United Nations. After Dr. Brand's evaluation, Kerns arranged for the survivors to meet with a psychologist whom he had retained to assist with his case. That psychologist, George Hough, PhD, evaluated Mechler in October at Kern's direction and again in December when Mechler was home on vacation. Later, after Mechler filed this claim, Hough began treating Mechler regularly. At some point prior to litigation before the ALJ, Hough formed a diagnosis of Mechler based on the October and December 2004 evaluations. He concluded that Mechler was suffering from depression, post-traumatic stress disorder, and possibly a histrionic personality disorder. There is no evidence in the record that this diagnosis or any of the results of the evaluation were ever communicated to Mechler.

In November, Captain Courage was deployed to Iraq and, with the exception of the second evaluation with Hough and one or two more visits by Dr. Brand,[1] there is no indication that Mechler received any further mental health treatment. On April 17, 2005, Dyncorp's successor in interest, Civilian Police International, informed Mechler and the other surviving employees that they would be sent home. This was a year earlier than provided for in her contract, and Mechler sought to stay the remaining year. She testified, however, that the State Department refused to grant its approval and informed her that she and the other survivors were being sent home for their "mental well-being."

Once Mechler returned to work at the Kansas DOC, she was prevented from carrying a

---

[1] In testimony Mechler contradicts herself about how many more times Dr. Brand came to Kosovo after the summer of 2004; once, or twice. Either way, as with his initial trip, Dr. Brand examined all of the survivors, and did not share his findings with any of them.

firearm. According to Mechler, the Kansas DOC became aware through media reports and gossip that she had been shot and sent home early from Kosovo. They believed she was mentally unfit to carry a weapon and assigned her to a desk job that paid less than what Mechler would have made if she had been able to continue on as special enforcement officer.

On April 16, 2006, Mechler filed a claim for workers' compensation under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* ("Longshore Act" or "Act"), as extended by the Defense Base Act, 42 U.S.C. §§ 1651 *et seq.* She sought, *inter alia*, periodic benefits to cover the difference in salary between her former and current jobs at the Kansas DOC—a demotion, she asserted, caused by her ongoing psychological problems. When the District Director of the Department of Labor's Office of Worker's Compensation Programs was unable to resolve the claim informally, he referred it to an ALJ on September 8, 2006 for formal disposition. Applying the Longshore Act's one year statute of limitations, the ALJ found that Mechler's claim was time barred because she "should have been aware that her injuries would likely result in an impairment of her earning capacity at the time of Dr. Hough's evaluation of October 2004." The ALJ based this finding in part on Mechler's testimony that she thought Dr. Hough was retained as part of an effort to rebut a potentially negative diagnosis by Dr. Brand. The ALJ also noted that Dr. Hough himself "diagnosed [Mechler] with mental impairments following his evaluation in October, 2004," and that Mechler had sought treatment for "a multitude of psychological symptoms" ahead of time. As such, the ALJ dismissed Mechler's claim as untimely.[2]

---

[2] On motion for reconsideration, the ALJ subsequently granted Mechler's claim for direct medical expenses.

Mechler appealed within the agency, and the Benefits Review Board ("Board") reversed and remanded. *E.M. v. Dyncorp Int'l*, 42 Ben. Rev. Bd. Serv. (MB) 73 (2008). After noting that the ALJ should have applied a statutory presumption in favor of timeliness, the Board reviewed the record and concluded that there was not substantial evidence to support the ALJ's finding that by October 2004 Mechler was constructively aware of the connection between her psychological injury and her future earning capacity. The Board was particularly concerned by what it perceived as the ALJ's reliance on evidence related to Mechler's temporary physical impairment immediately following the shooting.

On remand, the ALJ awarded Mechler disability benefits based on her psychological impairment. Dyncorp and its insurance carrier, Fidelity and Casualty Company of New York/CNA International, (collectively "Petitioners") appeal.

**Discussion**

In relevant part, section 13(a) of the Longshore Act, 33 U.S.C. § 913(a), states that "[t]he time for filing a claim shall not begin to run until the employee or beneficiary is aware, or by the exercise of due diligence should have been aware, of the relationship between the injury or death and the employment." The conventional interpretation of this provision—relied on by both the ALJ and Benefits Review Board below—is that a claim under the Act accrues "when the employee knows or should know that the injury is work related, and knows or should know that the injury will impair the employee's earning power." *Paducah Marine Ways v. Thompson*, 82 F.3d 130, 134 (6th Cir. 1996) (citing cases from the First, Fourth, Fifth, Ninth, Eleventh, and D.C. Circuits). We agree that this is the appropriate standard for measuring the timeliness of

6

claims filed under the Act. We also adopt the Board's position that claims like Mechler's are presumed timely. *See E.M. v. Dyncorp Int'l*, 42 Ben. Rev. Bd. Serv. (MB) 73 (2008) (applying statutory presumption contained in section 20(b) of the Act, 33 U.S.C. § 920(b), to the timeliness of a claim). Thus, only by producing "substantial evidence," *see* 33 U.S.C. § 920(b), of untimeliness can an employer successfully raise a statute of limitations defense under the Act.

Here, Petitioners assert that they met their burden of production and that the ALJ's initial finding of untimeliness *was* supported by substantial evidence. They seek to characterize the Board's review in this case, not as one for substantial evidence, but rather as an exercise in unauthorized fact-finding. We review the Board's decision for adherence to the Board's statutory standard of review, *Rasmussen v. Gen. Dynamics Corp., Elec. Boat Div.*, 993 F.2d 1014, 1015-16 (2d. Cir. 1993), and conclude that the Board's decision was proper.

In appealing to the Board the dismissal of her claims, Mechler challenged one of the ALJ's factual findings—to wit, that by October 2004 she had constructive knowledge of a permanent impairment of her earning power. Under section 21(b)(3) of the Longshore Act, 33 U.S.C. § 921(b)(3), an ALJ's findings of fact are binding on the Board as long as they are supported by substantial evidence. Thus, in conducting its review of the ALJ's finding of constructive knowledge, it was incumbent on the Board to decide whether that finding was supported by substantial evidence. In our review of the Board's decision we must determine whether the Board exceeded its limited authority to reverse the ALJ's factual finding. Thus, we need to review the administrative record ourselves and determine whether the ALJ's finding in question was indeed supported by substantial evidence. *See, e.g.*, *Rainey v. Dir., OWCP*, 517 F.3d 632, 634-47 (2d Cir. 2008); *New Haven Terminal Corp. v. Lake*, 337 F.3d 261, 266-67 (2d

7

Cir. 2003); *Blanding v. Dir, OWCP*, 186 F.3d 232, 236-37 (2d Cir. 1999).  If it was supported by substantial evidence, then the Board, in reversing it, obviously engaged in a more searching factual review (or possibly *de novo* fact finding) of the type not permitted under the Longshore Act.  If the ALJ's finding was not supported by substantial evidence, however, then the Board's review was proper under the statute and must be affirmed.

Substantial evidence is evidence that a "reasonable mind" would find adequate to support a particular finding or conclusion.  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Commentators have suggested, however, that it might be more appropriate to refer to a "reason*ing* mind" rather than a "reason*able* mind" because the inquiry requires evaluation of the judgment used arriving at a finding or conclusion, not the ultimate correctness—or "reasonableness" of that finding.  *See* Steven Alan Childress & Martha S. Davis, *Federal Standards of Review* § 15.04 (3d ed. 1999) (citing Louis L. Jaffee, *Judicial Control of Administrative Action* 596 (1965)).

Reviewing the record as a whole, we have no trouble concluding that the evidence in this case is not of the quantity or character that would allow a reasonable (reasoning) mind to conclude that Mechler had enough information—either from Dyncorp, her healthcare providers, or other sources—to realize more than one year before she filed her claims that her psychological problems would result in a permanent loss in earning capacity.[3]  That is, in our independent review of the administrative record we determine that the ALJ's finding of

---

[3] We note that there is almost no evidence that Mechler, herself, believed she was permanently impaired more than one year before filing her claim.

8

constructive knowledge was not supported by substantial evidence, and therefore, in reversing this finding, the Board did not exceed its statutory standard of review.

In support of their argument that there was substantial evidence in the record to support the ALJ's finding, Petitioners point to evidence that after the shooting, but before April 2005—one year before she filed a claim for compensation—Mechler: (1) changed assignments at Dyncorp; (2) sought psychological counseling from the Army; (3) obtained a prescription for sleeping and anti-anxiety medication from a psychiatrist; (4) submitted to a psychological evaluation ordered by Dyncorp and agreed to an independent psychological evaluation, purportedly to rebut the findings of Dyncorp's evaluation; and (5) was experiencing symptoms associated with post-traumatic stress disorder. Taken separately or in combination, however, this evidence does not amount to substantial evidence; it does not form a basis from which a reasoning mind could find constructive awareness of permanent earning impairment.

Petitioners argue that because after the shooting Mechler was given light duty work, which she still could not complete, she should have been aware of a diminution in her earning capacity. But the record is clear that Mechler's reassignment to administrative duty and her initial struggle to fulfill these tasks were related to the *physical* effects of having been shot through the leg, not the psychological effects, which later prevented her from resuming work within fugitive apprehension—i.e. because she was not permitted to carry a gun due to her mental state. Indeed, during her testimony about these events, Mechler emphasized that she returned to Dyncorp only two days after the shooting and had difficulty working at first because she was still on crutches. After her physical wounds healed, Mechler was returned to full-time active duty with Dyncorp.

9

Petitioners also contend that by seeking counseling from Captain Courage in the aftermath of the shooting, Mechler evinced an awareness of her disability. If attending bi-monthly counseling sessions was alone sufficient to demonstrate a mental impairment, however, then numerous fully functioning people in this country would be on disability. It is not reasonable to infer that Mechler's psychological problems were so severe as to affect her job prospects simply because she was enrolled in limited therapy. Nor is the fact that Mechler would sometimes leave work early to see Captain Courage indicative of her disability. There is no evidence in the record that the Kansas DOC transferred Mechler to a desk job because it believed potential appointments with a therapist would conflict with her duties as a special enforcement officer to such an extent as to permanently impair Mechler's earning power.

Petitioners assert that Mechler should have been aware of her disability when, at Captain Courage's referral, a psychiatrist prescribed her medication and imposed certain limitations on her working hours. Yet, as with participation in counseling, anti-anxiety drugs and sleeping aids are common in our society. It is not reasonable to conclude that because Mechler was prescribed Zoloft and Trazadone, she should have been aware that she was permanently disabled. That her use of the sleeping aid required Mechler to give up night shifts and thereby necessitated a transfer from one of Dyncorp's prisons to another is irrelevant in this case. There is nothing in the record indicating that Mechler's former job at the Kansas DOC required unusual hours, or that her inability to work nights was the reason for her transfer to desk duty.

Petitioners claim that Mechler should have become aware of the likelihood that she was mentally disabled when Dyncorp sent one of its employees, Dr. Brand, to evaluate "her fitness to perform." They argue that Mechler in fact demonstrated such awareness by agreeing to be

10

evaluated by Hough in the hopes that he would provide a more positive assessment. This is not a reasonable conclusion. Brand evaluated *all* of the Dyncorp employees that witnessed the shootings, and he did not share with them his findings.[4] Instead, he told Mechler that she was "doing as well as could be expected." Nor does Mechler's experience with Hough imply that she believed Brand had diagnosed a mental impairment. Hough's evaluation—which was arranged by a plaintiffs' lawyer—appears to have been solely in preparation for possible proactive litigation against the Jordanian Government, the United Nations, and, conceivably, Dyncorp, *see supra* note 4. As with Brand, it seems that Hough met, not just with Mechler, but with all of the Dyncorp employees that survived the shooting.

Petitioners' final argument is that, based on the result of Hough's October and December 2004 evaluations, Mechler should have known of her disability because she was, at that time, experiencing symptoms of depression and post traumatic stress disorder. It is true that in a report filed in August 2006—four months *after* Mechler filed her claim—Hough described various symptoms that he observed in Mechler during his evaluations and diagnosed her with depression and post traumatic stress disorder. The ALJ relied heavily on this report to conclude by the time of Hough's first evaluation that "her mental condition was more than a temporary condition." But the record gives no indication that Hough communicated his diagnosis to Mechler before April 2005, or that he had even arrived at one before then. Moreover, that a psychologist observes symptoms in a patient during an unsolicited evaluation does not imply that the patient

---

[4] Because Petitioners did not introduce Brand's report into evidence, his findings remain unknown. Although Mechler testified that she believed the purpose of his evaluation was "to see if we were fit to remain in the mission," the presence of a plaintiffs' lawyer among the shooting victims around the time of Brand's visit implies an alternative explanation for why Dyncorp would want an in-house medical examination of its employees.

is consciously aware of the full extent of the symptoms herself. This is especially true where denial, which is often associated with post-traumatic stress disorder, is one of the symptoms. Finally, it not reasonable to conclude that a patient in Mechler's position—even if fully aware of the symptoms—would understand the consequences of such symptoms on her earning capacity. Mechler likely did realize, at some level, that she was psychologically distressed when she met with Hough, but, because she was not experiencing problems at work, she had no reason to link those problems to her job prospects.

Considered as a whole, the record shows that throughout the year following the shooting, Mechler's work was largely unaffected by whatever psychological problems she was then experiencing. It shows that she did seek therapy and medication related to these problems, but that neither of these treatments was of the sort typically associated with debilitating mental illness. Finally, it shows that Mechler, along with every other surviving member of her team, submitted to psychological evaluations, the findings of which were not shared with her. On this evidence, a reasoning mind could not conclude that Mechler knew or should have known that she had suffered a permanent impairment of earning power before April 2005.

Because the ALJ's factual finding with respect to constructive awareness was not supported by substantial evidence, the Board did not overstep the limits of its appellate jurisdiction when it reversed that finding.

**Conclusion**

Accordingly, the order of the Board reversing the ALJ's dismissal of Mechler's claims is **Affirmed.**

12