UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1698**

HUNTINGTON INGALLS INDUSTRIES, INC., f/k/a Northrup Grumman
Shipbuilding, Inc.,

Petitioner,

v.

RICKY N. EASON; DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,

Respondents.

On Petition for Review of an Order of the Benefits Review Board.
(13-0573)

Argued: March 25, 2015                    Decided: June 2, 2015

Before NIEMEYER and FLOYD, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Petition granted by published opinion. Senior Judge Hamilton
wrote the opinion, in which Judge Niemeyer and Judge Floyd
joined.

**ARGUED:** Jonathan Henry Walker, MASON, MASON, WALKER & HEDRICK,
PC, Newport News, Virginia, for Petitioner. Matthew W. Boyle,
UNITED STATES DEPARTMENT OF LABOR, Washington, D.C.; Gregory
Edward Camden, MONTAGNA, KLEIN, CAMDEN, LLP, Norfolk, Virginia,
for Respondents. **ON BRIEF:** M. Patricia Smith, Solicitor of
Labor, Rae Ellen James, Associate Solicitor, Mark Reinhalter,
Counsel for Longshore, Gary K. Stearman, Counsel for Appellate

Litigation, Office of the Solicitor, UNITED STATES DEPARTMENT OF
LABOR, Washington, D.C., for Federal Respondent.

---

HAMILTON, Senior Circuit Judge:

Huntington Ingalls Industries, Inc. (HI) petitions for review of the May 16, 2014 decision of the Benefits Review Board (BRB) upholding the August 16, 2013 decision of Administrative Law Judge (ALJ) Daniel Sarno, Jr. (Judge Sarno) granting the claim of Ricky Eason (Eason) for temporary partial disability under the Longshore and Harbor Workers' Compensation Act (LHWCA or the Act), 33 U.S.C. §§ 901-950.[1] For the reasons that follow, we grant the petition for review and remand the case to the BRB to enter an order dismissing Eason's claim for temporary partial disability under the LHWCA.

I

A

The LHWCA establishes a federal worker's compensation system for employees injured, disabled, or killed in the course of covered maritime employment. See generally id. § 907 (medical services and supplies to treat injury), id. § 908 (compensation for disability), id. § 909 (compensation for

---

[1] Eason's filing of his disability claim brought the Director of the Office of Workers' Compensation Programs (OWCP), United States Department of Labor (the Director) into the case as an interested party. Cf. Ingalls Shipbuilding, Inc. v. Dir., OWCP, 519 U.S. 248, 262-70 (1997) (holding that the Director may appear as respondent in the courts of appeals when review is sought of a BRB decision).

death).  Like other worker's "compensation regimes--limited liability for employers; certain, prompt recovery for employees--the LHWCA requires that employers pay [disability] benefits voluntarily, without formal administrative proceedings." Roberts v. Sea-Land Servs., Inc., 132 S. Ct. 1350, 1354 (2012); see also 33 U.S.C. § 904 ("Every employer shall be liable for and shall secure the payment to his employees of the compensation payable under sections 907, 908, and 909 of this title.").

The LHWCA defines "[d]isability," in pertinent part, as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment."  33 U.S.C. § 902(10).  Four different categories of disabilities are set forth in the LHWCA: (1) permanent total disability; (2) temporary total disability; (3) permanent partial disability; and (4) temporary partial disability.  Id. § 908(a)-(c), (e).

No standard is set forth in the LHWCA to determine the degree of a disability (total or partial) or the duration of a disability (permanent or temporary).  Because disability under the LHWCA is an economic concept, see Metro. Stevedore Co. v. Rambo, 515 U.S. 291, 297 (1995) ("Disability under the LHWCA, defined in terms of wage-earning capacity . . . , is in essence an economic, not a medical, concept."), the degree of a

- 4 -

disability cannot be measured by medical condition alone, Nardella v. Campbell Mach. Inc., 525 F.2d 46, 49 (9th Cir. 1975). Consideration must be given to the claimant's age, education, experience, mentality, ability to work as well as the extent of the physical injury, and the availability of suitable alternative employment. Fleetwood v. Newport News Shipbuilding & Dry Dock Co., 776 F.2d 1225, 1227 n.2 (4th Cir. 1985). With regard to duration, a claimant remains temporarily disabled until he reaches "maximum medical improvement." Stevens v. Dir., OWCP, 909 F.2d 1256, 1259 (9th Cir. 1990). Maximum medical improvement marks the time where "normal and natural healing is no longer likely" to occur. Pac. Ship Repair & Fabrication Inc. v. Dir., OWCP [Benge], 687 F.3d 1182, 1185 (9th Cir. 2012) (citation and internal quotation marks omitted). Thus, the "maximum medical improvement date 'triggers a change in the classification of a claimant's disability from temporary to permanent.'" Id. (quoting Haw. Stevedores, Inc. v. Ogawa, 608 F.3d 642, 653 (9th Cir. 2010)).

Which of the four categories of disability the claimant falls in dictates the amount of compensation paid to him by his employer. A permanently totally disabled employee is entitled to weekly compensation amounting to two-thirds of his pre-injury average weekly wage for as long as he remains permanently totally disabled. 33 U.S.C. § 908(a); Roberts, 132 S. Ct. at

- 5 -

1354. The compensation payable for a temporary total disability remains fixed at that two-thirds figure, while weekly compensation for a permanent total disability is annually adjusted to reflect increases to the national average weekly wage. 33 U.S.C. § 910(f).

The LHWCA recognizes two types of permanent partial disability. One, commonly referred to as "unscheduled" or "non-scheduled" compensation, is based on the employee's actual loss of wage-earning capacity and, like total disability, is compensated at two-thirds of the difference between the employee's average weekly wage at the time of injury and his post-injury wage-earning capacity. Id. § 908(c)(21). The other, commonly referred to as "scheduled" compensation, covers specified body parts, and pays a fixed number of weeks of compensation at two-thirds of the employee's average weekly wage. Id. § 908(c)(1)-(17), (20). These scheduled amounts compensate for a presumed (not actual) loss of wage-earning capacity. Korineck v. Gen. Dynamics Corp. Elec. Boat Div., 835 F.2d 42, 43-44 (2d Cir. 1987). For example, the loss of a leg under the schedule entitles a claimant to 288 weeks of compensation at two-thirds of his average weekly wage. 33 U.S.C. § 908(c)(2). For a partial loss of the use of a leg, which includes knee injuries, the number of weeks is multiplied by the percentage of loss. Id. § 908(c)(19). Thus, a claimant

- 6 -

with a 50% loss of the use of his leg would receive compensation for 144 weeks. Notably, a claimant who is permanently partially disabled due to a scheduled injury cannot choose to be compensated for his actual loss of wage-earning capacity under § 908(c)(21), even though the compensation under § 908(c)(21) potentially may be greater than the compensation paid under the schedule. See Potomac Electric Power Co. [PEPCO] v. Dir., OWCP, 449 U.S. 268, 270-71 (1980) (holding that a claimant who was permanently partially disabled due to a scheduled injury could not choose to be compensated for his actual loss of wage-earning capacity under § 908(c)(21) rather than being compensated for his loss as provided by the schedule).

Compensation for temporary partial disability is "two-thirds of the difference between the injured employee's average weekly wages before the injury and his wage-earning capacity after the injury in the same or another employment." 33 U.S.C. § 908(e). Under the LHWCA, temporary partial disability compensation cannot be paid for a period longer than five years. Id.

Once the claimant is classified in a particular disability category, he need not necessarily remain in such category. Benge, 687 F.3d at 1185. This is so because permanent/temporary and total/partial are fluid concepts and not "cast in stone." Id. at 1186. Reclassification of a disability requires a

showing of a "change[] [in] circumstances." Id. at 1185; see also 33 U.S.C. § 922 (providing that, with certain time limits, "on the ground of a change in conditions . . . , the deputy commissioner may . . . , whether or not a compensation order has been issued . . . , review a compensation case . . . [and] issue a new compensation order which may terminate, continue, reinstate, increase, or decrease such compensation, or award compensation"). For example, a claimant with a permanent partial disability may become permanently totally disabled or temporarily totally disabled if his injury worsens and renders him permanently or temporarily totally disabled. See Benge, 687 F.3d at 1185-87 (holding that permanent partial disability claimant became temporarily totally disabled following surgery to treat injury). Likewise, a claimant with a permanent total disability may be reclassified to having a permanent partial disability if suitable alternative employment becomes available. See Stevens, 909 F.2d at 1259-60 (holding that a permanent total disability changes to a permanent partial disability when suitable alternative employment becomes available to claimant). It is also possible that a disability deemed permanent and total or permanent and partial may improve "due to a remarkable recovery, advances in medical science, or other reasons" such that the claimant may be recharacterized as temporarily totally

disabled or temporarily partially disabled.  Benge, 687 F.3d at 1185.

B

On September 28, 2008, Eason injured his right knee while employed as a pipe fitter at Newport News Shipbuilding and Dry Dock Company (NNS) in Newport News, Virginia.[2]  He went to the medical clinic at NNS on October 1, 2008, complaining of pain in his right knee.  The injury, which was diagnosed on October 14, 2008 as a torn meniscus requiring surgery, kept Eason completely out of work from October 2, 2008 through June 28, 2009.  As a result, HI paid Eason temporary total disability benefits for this period.

On June 29, 2009, Eason returned to work at NNS full-time as a pipe fitter.  On September 23, 2009, Eason was evaluated at Tidewater Physical Therapy and given a 14% lower extremity permanent impairment rating.  Sometime in October 2009, Dr. David Hoang (Dr. Hoang), Eason's treating orthopedic surgeon, "signed off" on the 14% rating, and, thus, Eason reached maximum medical improvement for purposes of determining his eligibility for permanent partial disability compensation.  (J.A. 180).  Based on the 14% lower-extremity permanent impairment rating, HI

---

[2] At the time of Eason's injury, NNS was owned by Northrop Grumman Shipbuilding, Inc. (NGS).  In 2011, HI purchased NNS from NGS.  For ease of reference, we will refer to NGS as HI.

paid Eason from October 16, 2009 through May 17, 2010, and from May 19, 2010 through July 25, 2010, 40.28 weeks of scheduled compensation for permanent partial disability at $992.29 (two-thirds of his pre-injury average weekly wage of $1,488.43) per week. See 33 U.S.C. § 908(c)(2) (loss of leg provides 288 weeks of scheduled compensation); id. § (c)(19) (permanent partial loss "may be for proportionate loss or loss of use of the member").[3] Thus, for approximately seven months, Eason received scheduled permanent partial disability compensation in addition to his regular weekly salary for performing his duties as a pipe fitter at NNS.

Eason continued to work full-time as a pipe fitter through May 17, 2010. On May 18, 2010, Eason met with Dr. Hoang and reported that "his left knee was acting up on him and his right knee was getting stiff intermittently, especially after sitting for awhile." (J.A. 180). Dr. Hoang noted "mild soreness" in the right knee and "tenderness" in the left knee, (J.A. 83), and he put Eason on light duty restrictions for both knees. These

_____

[3] HI paid 40.28 weeks of compensation for the scheduled injury, rather than 40.32 weeks (288 weeks x .14 = 40.32 weeks). Although the record under review is unclear as to why the difference exists, it may well be because HI paid an intervening day (May 18, 2010) of compensation for temporary total disability. In any event, the .04 difference is not at issue in this appeal.

light duty restrictions prevented Eason from performing his duties as a pipe fitter.

On his June 3, 2010 visit with Dr. Hoang, Eason reported that his left knee "still hurts" and that his right knee was "improving." (J.A. 83). Dr. Hoang advised Eason to "continue with the same work restrictions." (J.A. 84). On July, 16, 2010, Eason reported to Dr. Hoang that his right knee was "doing well" but the left knee was "grinding." (J.A. 84). Dr. Hoang directed Eason to "continue with the light duty [restrictions]." (J.A. 85). Over the next month, Eason's condition improved, and he returned to work full-time as a pipe fitter at NNS on August 10, 2010.

Between May 19, 2010 and August 9, 2010, NNS did not offer Eason light-duty employment within his restrictions. In addition, during this period, Eason did not seek suitable alternative employment within the relevant labor market.

C

Eason brought a claim against HI for temporary total disability or, alternatively, temporary partial disability for the May 19, 2010 through August 9, 2010 time period. In support of his claim, Eason argued that during this time period he "was not at maximum medical improvement." (J.A. 13). He posited that he was "undergoing ongoing medical treatment" and "under temporary [work] restrictions." (J.A. 13). Because no suitable

- 11 -

alternative employment was available, he argued he was entitled to temporary total disability compensation. Alternatively, Eason argued that, even if HI's alternative employment data were entitled to "any weight," he was entitled to temporary partial disability compensation because his pre-injury salary exceeded the salary of any alternative employment available. (J.A. 13). Eason posited that, even though he received scheduled permanent partial disability compensation for his knee injury, such compensation did not prevent the recovery of additional compensation for a temporary partial disability due to a flare up of that injury. In response, HI argued that Eason reached maximum medical improvement in October 2009. Because Eason reached maximum medical improvement at that time and received permanent partial disability compensation under the schedule, HI posited that he was not entitled to any additional temporary compensation--either total or partial--under the Supreme Court's decision in PEPCO. HI stressed that Eason's scheduled compensation for his knee injury presumed his actual loss of wage-earning capacity for that injury, such that any temporary compensation (total or partial) sought for a flare up of that injury already was covered by the payments made under the schedule.

A hearing was held before ALJ Richard Malamphy (Judge Malamphy). In his decision, Judge Malamphy found that Eason

reached maximum medical improvement in October 2009. He also found that the evidence did not support Eason's claim of temporary total disability. With regard to temporary partial disability, relying on the Supreme Court's decision in PEPCO, Judge Malamphy ruled that Eason's disability compensation for his knee injury was limited to the amount required by the schedule. He explained that "[t]he Act presumes that the scheduled award fully compensates claimant for any loss in wage-earning capacity" and, "[t]herefore, any temporary loss of wage earning capacity Claimant suffered is not compensable in addition to the scheduled award." (J.A. 184). In other words, Judge Malamphy held that the scheduled compensation award compensated Eason for his knee injury and that Eason was not entitled to additional compensation for any temporary partial loss of wage-earning capacity for that same injury.

On appeal, the BRB vacated Judge Malamphy's decision. The BRB affirmed Judge Malamphy's finding that Eason reached maximum medical improvement in October 2009. The BRB ruled, however, that this finding did not preclude the recovery of temporary partial disability compensation for Eason's knee injury. Referring to language in PEPCO that states "that a scheduled injury can give rise to an award for permanent total disability" and that "once it is determined that an employee is totally disabled the schedule becomes irrelevant," 449 U.S. at 277 n.17,

- 13 -

the BRB found that "the fact that permanent partial disability benefits were fully paid under the schedule is not determinative of a claimant's entitlement thereafter to permanent total, temporary total, or temporary partial disability benefits." (J.A. 188-89). Consequently, the BRB remanded the case to the ALJ to determine whether Eason's work restrictions from May 19, 2010 through August 19, 2010 prevented him from performing his usual work. If they did, the BRB stated, Eason would have established a prima facie case of temporary total disability. See Newport News Shipbuilding & Dry Dock Co. v. Dir., OWCP, 315 F.3d 286, 292 (4th Cir. 2002) (noting that an LHWCA "claimant must first establish a prima facie case by demonstrating an inability to return to prior employment due to a work-related injury"). The burden would then shift to HI to establish the availability of suitable alternative employment that Eason was capable of performing. See id. (outlining burden shift). According to the BRB, HI could meet its burden by showing that suitable alternative employment was available to Eason in the relevant labor market. See id. at 293 (noting that an employer meets its burden by demonstrating, inter alia, that suitable alternative employment was available in the relevant labor market). Thus, on remand, the BRB required the ALJ to determine if HI met its burden, such that its obligation to pay disability benefits would be reduced or eliminated. See id. ("Under our

- 14 -

precedent, if the employer meets its burden, its obligation to pay disability benefits is either reduced or eliminated, unless the disabled employee shows that he diligently but unsuccessfully sought appropriate employment." (citation and internal quotation marks omitted)).

On remand, the case was reassigned to Judge Sarno. Judge Sarno found that Eason was not able to return to his usual work from May 19, 2010 through August 9, 2010. However, Judge Sarno found that HI had established the availability of suitable alternative employment for 32 hours per week at $7.25 per hour. Judge Sarno concluded that Eason was temporarily partially disabled from May 19, 2010 through August 20, 2010 and entitled to compensation of $845.82 per week (two-thirds of the difference between $1,488.43 per week, Eason's average weekly wage at the time of the injury, and $219.70 per week, Eason's residual wage-earning capacity based on the national average weekly wage in 2008, the year of Eason's injury).[4]

---

[4] Judge Sarno noted that HI had established that Eason had a wage-earning capacity under § 908(e) of $232.00 per week in 2010. This amount was adjusted downward to $219.70 per week in order to account for inflation between 2008 and 2010. See Walker v. Wash. Metro. Area Transit Auth., 793 F.2d 319, 321 n.2 (D.C. Cir. 1986) ("In order to make a fair comparison between wages, the Board looks to the amount the post-injury job paid at the time of the claimant's injury. This allows the Board to compare the wages without worrying about the effect of inflation."); Quan v. Marine Power & Equip. Co., 30 BRBS 124, 1996 WL 581786, at *4 (BRBS 1996) ("Sections 8(c)(21) and 8(h) (Continued)

HI appealed Judge Sarno's decision to the BRB, arguing once again that Eason was precluded from receiving any additional compensation in addition to that received under the schedule. The BRB found that it had already rejected that argument in its earlier decision. It also affirmed, as unchallenged on appeal, Judge Sarno's findings that Eason was unable to perform his usual work from May 19, 2010 through August 20, 2010 and that HI had established suitable available alternative employment. Consequently, it affirmed Judge Sarno's award of compensation for temporary partial disability from May 19 through August 20, 2010.[5] It is from this BRB decision that HI filed its timely petition for review.

II

We review the BRB's decision for errors of law and to ascertain whether the BRB adhered to its statutorily-mandated standard for reviewing the ALJ's factual findings. Gilchrist v. Newport News Shipbuilding & Dry Dock Co., 135 F.3d 915, 918 (4th

---

require that a claimant's post-injury wage earning capacity be adjusted to account for inflation to represent the wages that the post-injury job paid at the time of claimant's injury.").

[5] Because he returned to work on August 10, 2010, Eason concedes that Judge Sarno (and the BRB) erroneously awarded temporary partial disability compensation from August 10, 2010 through August 20, 2010.

- 16 -

Cir. 1998). As to the BRB's interpretation of the LHWCA, our review is de novo because the BRB is not a policy-making agency and, thus, its statutory interpretation is not entitled to any special deference from us. Id. However, the Director's reasonable interpretation of the LHWCA is entitled to some deference. See Norfolk Shipbuilding & Drydock Corp. v. Hord, 193 F.3d 797, 801 (4th Cir. 1999) ("We note that this is the result advocated by the Director of the Office of Workers' Compensation Programs, to whose reasonable interpretation of the LHWCA we accord some deference.").

In its petition for review, HI challenges Judge Sarno's award of temporary partial disability benefits from May 19, 2010 through August 20, 2010. HI argues that a claimant, like Eason, who receives scheduled compensation for a permanent partial disability cannot subsequently receive additional temporary partial disability compensation because the receipt of scheduled permanent partial disability compensation for an injury includes any temporary partial disability compensation. Moreover, HI reads the LHWCA and PEPCO as precluding a claimant, like Eason, with a scheduled injury from receiving any additional temporary disability compensation--either total or partial--for the same injury.[6] Eason counters by arguing that receipt of scheduled

---

[6] HI concedes that a claimant who receives scheduled (Continued)

- 17 -

permanent partial disability compensation for an injury is not determinative of entitlement to temporary partial disability compensation for the same injury. According to Eason, PEPCO is not particularly helpful to HI because it only dealt with a permanent partial disability claim and not a claim, as here, for temporary partial disability. He suggests that his claim for temporary partial disability is viable because his knee injury flared up, preventing him from working as a pipe fitter from May 19, 2010 through August 9, 2010, though he apparently concedes that suitable alternative employment was available during that time. He also posits that his argument is supported by PEPCO because the Court there recognized the availability of total disability compensation for a scheduled injury.

The Director, while agreeing with the result urged by HI, takes a middle course. He agrees with HI that a scheduled permanent partial disability claimant cannot receive additional temporary partial disability compensation for the injury underlying the permanent partial disability compensation because such temporary compensation essentially is duplicative to the

permanent partial disability compensation is not precluded from subsequently receiving permanent total disability compensation. See Petitioner's Reply Br. at 2-3 (noting that scheduled compensation is "exclusive to all other forms of compensation, except for permanent total disability under 33 U.S.C. § 908(a) of the Act").

scheduled compensation. He also agrees with HI that a claimant who receives scheduled permanent partial disability compensation is not precluded from subsequently receiving permanent total disability compensation. However, the Director disagrees with HI that a claimant who receives scheduled permanent partial disability compensation for an injury is precluded from receiving temporary total disability compensation for the same injury. According to the Director, the LHWCA's statutory framework supports his construction of the Act and nothing in PEPCO precludes reclassification of a scheduled permanent partial disability to a temporary total disability. However, because Eason's injury has remained permanent and partial, the Director posits that reclassification of his injury is not warranted, and, thus, Eason is precluded from recovering any additional disability compensation for his knee injury.

We agree with the position espoused by the Director, which we accord some deference. Hord, 193 F.3d at 801. Eason suffered a scheduled injury. Thus, his permanent partial disability compensation is set by the schedule. PEPCO, 449 U.S. at 270-71. Such scheduled compensation is presumed to cover Eason's actual partial loss of wage-earning capacity due to that partial disability. See ITO Corp. of Balt. v. Green, 185 F.3d 239, 242 n.3 (4th Cir. 1999) ("The presumed effect of scheduled disabilities on a claimant's wage-earning capacity has been set

- 19 -

by Congress within a fairly narrow range.  Benefits are payable for a specific duration regardless of the actual impact of the disability on the claimant's prospects of returning to longshore (or any other) work."); Bethlehem Steel Co. v. Cardillo, 229 F.2d 735, 736 (2d Cir. 1956) (noting that, "as to any schedule loss, there is a conclusive presumption of loss or reduction of wage-earning capacity").  Once Eason's permanent partial disability compensation is set under the schedule, he is not entitled to receive additional disability compensation for the same scheduled injury unless the circumstances warrant a reclassification of that disability to permanent total or temporary total.  See, e.g., Benge, 687 F.3d at 1185-87 (permitting claimant, who received unscheduled permanent partial disability compensation, to receive temporary total disability compensation because subsequent surgery rendered her temporarily totally disabled); Hord, 193 F.3d at 801-02 (allowing claimant, who was paid permanent partial disability compensation under the schedule to recover temporary total disability compensation); DM & IR Ry. Co. v. Dir., OWCP, 151 F.3d 1120, 1122-23 (8th Cir. 1998) (allowing a claimant who received permanent partial disability compensation to subsequently recover disability compensation for permanent total disability); cf. PEPCO, 449 U.S. at 277 n.17 ("Indeed, since the § 8(c) schedule applies only in cases of permanent partial disability, once it is

determined that an employee is totally disabled the schedule becomes irrelevant."). This is so because, once a disability becomes total, it makes no sense to apply a presumption designed to approximate a claimant's permanent partial disability compensation. A permanent or temporary total disability presumes the loss of all wage-earning capacity, while a permanent partial disability involves only a partial loss. See Benge, 687 F.3d at 1187 (noting that any total disability presupposes the loss of all wage-earning capacity). Thus, an increase in the disability compensation for the change from permanent partial to either permanent total or temporary total is warranted to account for the additional actual loss in wage-earning capacity. Such a conclusion comports with the basic purpose of the LHWCA, which is to provide compensation for the actual loss of wage-earning capacity. See Korineck, 835 F.2d at 44 (noting that the purpose of the LHWCA is "to provide work benefits for lost earning capacity").

In contrast, in the case of a scheduled permanent partial disability that allegedly changes to a temporary partial disability because the claimant's injury flared up, there is no additional loss of wage-earning capacity. The claimant's loss of wage-earning capacity already is accounted for under the schedule. In other words, the scheduled compensation accounts for all the lost wages due the claimant under the LHWCA. To

- 21 -

hold otherwise would allow for an impermissible double recovery. Cf. id. ("Denying additional [scheduled] benefits to one already receiving benefits for total permanent disability serves to avoid double recoveries."). Like the claimant in Korineck, whose scheduled compensation claim was subsumed by the compensation he already was receiving for permanent total disability, Eason's temporary partial disability claim is subsumed by the compensation he received under the schedule. Id. at 43-44.

To be sure, in the case before us, there is no record evidence supporting a reclassification of Eason's disability to a permanent total or temporary total disability. His disability has remained permanent and partial since September 2008. His scheduled compensation is presumed to cover his actual loss of wage-earning capacity for any flare up of his knee injury that did not prevent him from working in some type of suitable alternative employment. Green, 185 F.3d at 242 n.3. Since Eason does not allege that the flare up rendered him permanently or temporarily totally disabled, he is not entitled to any additional disability compensation for his knee injury.

Eason's argument that the LHWCA permits the recovery of additional temporary partial disability compensation under the circumstances of this case is unpersuasive. First, his argument, if accepted, permits an impermissible double recovery.

He was compensated for his actual loss of wage-earning capacity due to his injury under the schedule and now he is seeking additional compensation for the same injury. We see nothing in LHWCA that permits such a double recovery. See Port of Portland v. Dir., OWCP, 932 F.2d 836, 839 n.1 (9th Cir. 1991) (noting that, under the LHWCA, "an employee may not obtain a double recovery for a disability for which compensation has already been paid"); cf. Strachan Shipping Co. v. Nash, 782 F.2d 513, 515 (5th Cir. 1986) (en banc) (noting that the "credit doctrine, created by the BRB for the singular purpose of avoiding double recoveries, provides that an employer is not liable for any portion of an employee's disability for which the employee has actually received compensation under the LHWCA"). Second, Eason's construction of the LHWCA defeats the intent of the schedule in the Act. The schedule is designed to provide quick compensation for certain permanent partial disabilities and, simultaneously, to fix the employer's liability exposure. See PEPCO, 449 U.S. at 282 ("The use of a schedule of fixed benefits as an exclusive remedy in certain cases is consistent with the employees' interest in receiving a prompt and certain recovery for their industrial injuries as well as with the employers' interest in having their contingent liabilities identified as precisely and as early as possible."); see also Travelers Ins. Co. v. Cardillo, 225 F.2d 137, 144 (2d Cir. 1955) (noting that

- 23 -

schedule "conclusively establishe[s]" the loss of wage-earning capacity and "its extent"). Yet, under Eason's construction of the LHWCA, the employer's liability exposure is anything but fixed. Rather, the liability exposure is subject to increase essentially any time a scheduled claimant is placed on temporary work restrictions. Such a construction of the LHWCA makes little sense.[7]

We also note that the Director understandably rejects HI's interpretation of the LHWCA because it forecloses the receipt of temporary total disability compensation following the receipt of scheduled disability compensation. HI's interpretation of the LHWCA has two flaws. First, it is inconsistent with Benge and Hord, where the permanent partial claimants were permitted to receive temporary total disability compensation after proper reclassification of their respective disabilities. Benge, 687 F.3d at 1185-87; Hord, 193 F.3d at 802. Second, HI's interpretation runs counter to the language of the LHWCA, which says that permanent partial disability compensation (scheduled or unscheduled) shall be paid "in addition to" the compensation

---

[7] Of course, nothing prevents a claimant who is receiving scheduled permanent partial disability compensation from seeking additional compensation to reflect a higher percentage of permanent loss of the relevant body part due to the aggravation of the injury that gave rise to the scheduled compensation. See New Haven Terminal Corp. v. Lake, 337 F.3d 261, 268-69 (2d Cir. 2003) (discussing the interplay of the aggravation rule and the credit doctrine).

paid for a "temporary total disability."  33 U.S.C. § 908(c). This language contains no temporal limitation.  Thus, such additional temporary total disability compensation can be paid before the permanent partial disability compensation (for example, as in this case, Eason received temporary total disability compensation for his injury before receiving scheduled compensation for the same injury) or after (for example, as in <u>Benge</u>, where the claimant received temporary total disability compensation for her injury after receiving unscheduled compensation for the same injury).  The receipt of such additional temporary total disability compensation ensures that the claimant is compensated for his actual loss in wage-earning capacity (including the loss <u>not</u> presumed by the schedule) and, thus, fulfills the basic purpose of the LHWCA. See <u>Korineck</u>, 835 F.2d at 44 (noting that the purpose of the LHWCA is "to provide work benefits for lost earning capacity"). Therefore, HI's construction of the LHWCA is inconsistent with the case law and thwarts the basic purpose of the LHWCA.

We realize that the schedule created by Congress allows for overcompensation in some instances and undercompensation in others.  For example, a claimant with a scheduled injury may be compensated even though he never misses a day of work and, thus, incurs no actual wage loss whatsoever.  At the same time, the schedule may undercompensate a claimant whose loss of wage

earning capacity may be greater than that compensated under the schedule. If a claimant who loses a hand only earns 50% of his pre-injury salary after reaching maximum medical improvement, the claimant would not, after 9.4 years, be compensated under the schedule as much as he would have been for an unscheduled injury. As recognized by the Supreme Court in PEPCO, such inequities simply are a manifestation of the system created by Congress which we are not at liberty to disturb. See 449 U.S. at 282-83 (noting that "requiring resort to the schedule may produce certain incongruous results" because, on the one hand, "even though a scheduled injury may have no actual effect on an employee's capacity to perform a particular job or to maintain a prior level of income, compensation in the schedule amount must be paid," while on the other hand, "the schedule may seriously undercompensate some employees"); id. at 284 (noting that the fact that the schedule "leads to seemingly unjust results in particular cases does not give judges a license to disregard it" where Congress employed "compelling statutory language"); see also Green, 185 F.3d at 242 n.3 ("Depending on one's point of view, this approach could reasonably be seen as either tending to overcompensate claimants with non-scheduled disabilities, or as under compensating those receiving payments pursuant to the schedule. Nonetheless, despite its inevitable inequities and the unwieldiness of its application, this aspect of the system

apparently functions in the manner intended by Congress, as evidenced by its being left essentially undisturbed since its enactment in 1927.").[8]

Finally, we reject both Eason's and HI's interpretation of PEPCO.[9] Eason interprets PEPCO as supporting his argument that a claimant who is receiving scheduled compensation for a permanent partial disability may receive additional compensation for temporary partial disability due to the same injury. HI's interpretation of PEPCO is quite different. It interprets the case as foreclosing a claimant who is receiving scheduled compensation for an injury from ever receiving temporary (total or partial) disability compensation for that injury.

In PEPCO, the Supreme Court addressed whether a claimant who was permanently partially disabled due to a scheduled injury could choose to be compensated for his actual loss of wage-

---

[8] Of course, Eason is on the overcompensation end of the equation. He was awarded actual partial wage loss for the May 19 through August 20, 2010 time period at a compensation rate of $845.82 per week (two thirds of the difference between his average weekly wage of $1,488.43 and his residual wage-earning capacity of $219.70 per week). Thus, Eason would receive $11,237.22 in actual partial wage loss compensation. By contrast, Eason's scheduled award entitled him to $40,009.13 in compensation (40.32 weeks x $992.29 per week). Thus, his scheduled award paid him $28,771.91 more for a presumed loss of wage-earning capacity than he would have been entitled to for his actual loss.

[9] The BRB's interpretation of PEPCO is in line with Eason's interpretation of that case.

earning capacity under § 908(c)(21), rather than being compensated for his presumed loss as provided by the schedule. 449 U.S. at 270.[10] The Court held that the LHWCA did not authorize such an election, and, therefore, a claimant's recovery for a scheduled injury "must be limited by the statutory schedule." Id. at 271. The Court focused on the language of § 908(c)(21), which calls for the payment of actual loss of wage-earning capacity "'[i]n all other cases'" of permanent partial disability. Id. at 274 (quoting 33 U.S.C. § 908(c)(21)). The Court interpreted this language to mean all permanent partial disability cases not specifically enumerated in the schedule, namely § 908(c)(1) to (20). Id. Thus, the Court held that injuries or disabilities covered by the schedule must be compensated according to the schedule, whereas permanent partial disabilities not covered by the schedule are subject to compensation based on the actual loss of wage-earning capacity. Id. at 278-82.

The Supreme Court in PEPCO rejected the argument that its construction of the LHWCA would not fulfill the remedial

_____

[10] As noted earlier, unscheduled permanent partial disability awards are based on the actual loss of wage-earning capacity. 33 U.S.C. § 908(c)(21). The claimant in PEPCO sought wage-loss compensation under § 908(c)(21) because his loss of wage-earning capacity was over 40% and § 908(c)(21) would have provided far more compensation than the schedule otherwise allowed. 449 U.S. at 271.

purposes of the Act and that it would produce anomalous results that Congress probably did not intend. Id. at 280-84. The Supreme Court pointed out that the LHWCA represents a compromise between the interests of employers and employees. Id. at 282. The Court stated that the use of fixed scheduled benefits as an exclusive remedy "is consistent with the employees' interest in receiving a prompt and certain recovery for their industrial injuries as well as with the employers' interest in having their contingent liabilities identified as precisely and as early as possible." Id. As noted above, the Court also recognized the incongruous results which the schedule could produce by over or undercompensating an employee for his actual loss in wage-earning capacity. Id. at 282-84. The Court stated, however, that this fact did not give it license to disregard the "compelling statutory language" and that it was up to Congress to reexamine the statute if anomalies were occurring frequently. Id. at 284.

Eason's interpretation of PEPCO is flawed. The Supreme Court in PEPCO did not imply, as he posits, that a claimant who is receiving scheduled compensation for a permanent partial disability can receive additional compensation for temporary partial disability due to the same injury. The Court merely said that a scheduled injury does not preclude an award of total disability. Id. at 277 n.17. This is not surprising since a

total disability increases the claimant's actual loss in wage-earning capacity. In any event, just because the Court cited with approval the receipt of total disability compensation following a scheduled injury, it does not follow that the Court would countenance the duplicative recovery that occurs when a claimant receives temporary partial disability compensation for an injury that the claimant already has received (or is receiving) scheduled compensation. As we noted above, the LHWCA does not permit such duplicative recoveries. See Port of Portland, 932 F.2d at 839 n.1 (noting that the LHWCA is designed to avoid double recoveries for the same injuries).

HI's interpretation of PEPCO also is flawed. The Court in PEPCO did not hold, as HI posits, that a claimant who is receiving scheduled compensation for an injury is foreclosed from receiving temporary (total or partial) disability compensation for that injury. Rather, as noted above, the Court simply held that a permanent partial disability claimant could not choose between the schedule and § 908(c)(21). 449 U.S. at 278-82. Thus, the Court did not address whether the receipt of scheduled compensation forecloses the receipt of additional temporary disability compensation, and we read nothing in PEPCO lending support for HI's interpretation of the case.

In sum, the PEPCO decision is not outcome determinative for either Eason or HI. The case addressed a discrete issue, and

the reasons advanced by Eason and HI for an expansive reading of the decision are not compelling.  Cf. Korineck, 835 F.2d at 44 (noting the "narrow issue" decided by the PEPCO Court).

III

For the reasons stated herein, we grant the petition for review and remand the case to the BRB to enter an order dismissing Eason's claim for temporary partial disability under the LHWCA.

PETITION GRANTED